**UNITED STATES of America**

v.

**Jean LUC–THIRION, Defendant.**

**No. CR–80–372.**

United States District Court,
E. D. New York.

Oct. 23, 1980.

Office U. S. Atty., Eastern District of New York, Marion Bachrach, Asst. U. S. Atty., New York City, for plaintiff.

Baden, Kramer & Huffman by Richard L. Huffman, New York City, for defendant.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendant, Jean Luc–Thirion, is charged with violating the federal narcotics laws.[1] Defendant has moved to suppress the physical evidence obtained as a result of an alleged illegal search.[2] A hearing was held on September 22 and 23, 1980. On September 23, 1980 this court rendered an oral opinion in which defendant's motion to suppress was denied. The decision which follows is offered to elaborate upon the court's ruling.

*Findings of Fact*

On July 13, 1979, defendant arrived at JFK International Airport on a Braniff flight from Peru, South America. Thereafter, the defendant entered the customs area, picked up his luggage and underwent the initial customs inspection. Customs Patrol Officer Marchesano ("Marchesano") testified in court that his attention was

1. The defendant is charged with violating the federal narcotics law in a two count indictment pursuant to 21 U.S.C. §§ 952(a), 960, 841.

2. The defendant's motion involved only the suppression of physical evidence, not the suppression of oral statements. The government has agreed to refrain from using certain oral statements in their case in chief; the statements, however, might be used for impeachment purposes consistent with *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

drawn to Thirion because of a multiplicity of factors. Specifically, Thirion proceeded from the inspection belt area at a very rapid pace, he was perspiring profusely and he appeared apprehensive.

The court, having the opportunity to study Marchesano's demeanor, finds his testimony to be fully credible. Marchesano, a trained Customs Officer, testified that South America is a "source" country and thus passengers arriving from this area warrant special scrutiny. Further, the court is aware that Thirion, at one point, was inches away from Marchesano. Thus, Marchesano could clearly detect any evidence of perspiration and could witness facial contortions which might indicate nervousness.

On the basis of Marchesano's suspicions, the officer, while positioned in the Custom's area of the airport, stopped the defendant several feet from the inspection belt area.[3] Marchesano requested general information and examined Thirion's passport, airline ticket and custom's declaration form. As a consequence of this routine questioning, the officer learned that the defendant was in transit to Canada from a "source" country.[4] Based upon his training, Marchesano's suspicions were further aroused by this additional information.[5]

At this stage, Marchesano and Thirion were in close proximity to one another and to the routine inspection belt. Marchesano testified that Thirion was perspiring. Further, the officer stated that during his routine questioning, the defendant appeared to become more apprehensive and to perspire more profusely. While in close contact with the defendant, Marchesano also noticed a slight bulge under Thirion's vest.[6]

The defendant, in his own behalf, took the witness stand and testified to the events of July 13, 1979. Much of his testimony paralleled the testimony of Officer Marchesano. The defendant explained that, after his luggage was examined by the regular customs inspector, he walked only a short distance before he was stopped by a second individual, Officer Marchesano. In contradistinction to Marchesano's testimony, however, Thirion claimed that he was neither nervous and perspiring, nor walking quickly.

The court finds that this latter testimony is incredible. Significantly, while the defendant was on the witness stand he appeared to be quite nervous. Further, Thirion testified that this was the first time that he acted as a drug carrier. It therefore stands to reason that the defendant would be apprehensive until his delivery was completed.

Marchesano testified that after the initial routine questioning his suspicions were further aroused. Thereafter, Thirion was

---

3. During the entire proceeding, the court was careful to scrutinize the testimony concerning both the defendant's positioning vis a vis the inspection belt area and the distance between the officer, the defendant and the stationed customs inspectors. Testimony was given to the effect that the defendant was approximately twenty feet from Marchesano when the officer first saw him; and six feet away from the inspection belt area when he was approached by Officer Marchesano.

4. It has been determined by the government that many Canadian narcotics smugglers use the United States as a stopping off point on route to Canada. Further, South America is a "source" country. A source country is one where narcotics are easily obtained.

5. The officer's suspicions were exacerbated when he realized that Thirion's connecting flight was not to depart for many hours, yet the

defendant was proceeding quickly from the area.

6. The defendant tried to demonstrate that the officer could not have perceived a bulge under the defendant's suit. The defendant stood in court and asked the officer whether or not he was wearing a packet under his suit at that moment. The court found this question to be irrelevant. Insofar as the search was a valid border search, no justification beyond the defendant's crossing our border was needed. *United States v. Nieves*, 609 F.2d 642, 646 (2d Cir. 1979). Even assuming that this stop and search was not a valid border search, reasonable suspicion is based upon a multiplicity of factors, not just one factor. *United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978). Finally, the setting at JFK International Airport, and the accompanying nervousness, perspiration and fast gait of the defendant cannot be likened to the setting of the courtroom proceeding.

asked to accompany the officer to a private customs area where a routine search could be conducted. Marchesano stated that he asked Thirion to follow him so that the customs inspection could be continued. Marchesano displayed no weapons and used no force. Significantly, the defendant testified that he voluntarily went to the private search room.

Once inside the room, the officer followed acceptable procedures for a routine border inspection. The officer asked the defendant to empty his pockets and to remove his jacket. Thirion testified that he freely consented to the search of his person and his luggage.[7]

Marchesano then described the details of the personal search which transpired. The officer conducted a pat down of the defendant. He felt Thirion's left and right sides and then touched his legs. As Marchesano reached for Thirion's left hip, the defendant jumped aside. The defendant again jumped when Marchesano merely reached for Thirion's right hip. In light of the foregoing steps followed by Marchesano, the court finds that such procedures were acceptable and routine.

At this point, Marchesano became extremely suspicious. Specifically, the officer questioned Thirion's reaction to the routine procedure of reaching for the defendant's hip. The court finds that this suspicion was justified under the circumstances. Marchesano then proceeded to touch the defendant's back. Upon placing his hand upon the small of the defendant's back, the officer felt a large protrusion. The defendant became perceptibly vexed and explained that the protrusion was a back brace. Yet, as Officer Marchesano testified, the defendant carried no medication. The officer then asked Thirion to touch the floor. The defendant did so without showing signs of pain. Based upon the testimony, the court finds that once Marchesano felt the protrusion and once a suitable ex-

planation was not forthcoming, the officer was justified in housing serious reservations about the circumstances surrounding the protrusion.

Thereafter, Officer Marchesano asked the defendant to remove his vest and shirt. Once the shirt was removed, Marchesano saw two packages draped around the defendant. The packages contained cocaine. The defendant was then read his *Miranda* warnings and was placed under arrest.

### Conclusions of Law

It is well established that routine border searches conducted for the purpose of controlling the movement of people across our national boundaries do not violate the Fourth Amendment's prohibition against unreasonable searches. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Nieves*, 609 F.2d 642 (2d Cir. 1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980); *United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978). *See also United States v. Ajlouny*, 629 F.2d 830 (2d Cir. 1980). Thus, border searches are deemed to be reasonable by the single fact that an individual has entered into our country from a foreign country. *United States v. Ramsey, supra*, 431 U.S. at 619, 97 S.Ct. at 1980.

The defendant, however, claims that the initial stop and the subsequent search by Officer Marchesano at JFK International Airport contravened his constitutional rights. First, the defendant contends that he was no longer within the customs inspection area when the officer questioned him, and therefore, the stop should not be characterized as a border stop. Second, the defendant explains that insofar as the officer's initial contact is not to be classified as a valid border stop, the stop must be supported by reasonable suspicion. The defendant claims that the officer lacked reasonable suspicion and therefore the evidence obtained as a result of this alleged illegal stop and search must be suppressed.

---

7. While the private room where the search was conducted may be considered small, there was absolutely no showing of intimidation or coercion. On the other hand, the defendant himself testified that he voluntarily accompanied the officer and assented to the officer's subsequent requests.

■ The court finds that the defendant's contentions are without merit. The initial contact between Officer Marchesano and the defendant must be characterized as a valid border search. *See, e. g., United States v. Nieves, supra.* Accordingly, the stop needed no justification beyond that provided by the defendant's decision to enter this country. *United States v. Asbury, supra* at 975. *See also United States v. Nieves, supra* at 646.

Here, the defendant was in close proximity to the inspection area, he had not passed through the customs clearing point, and the time interval between the initial inspection by the regular customs inspector and the contact by Officer Marchesano involved only a few minutes. As indicated in court, Thirion had walked no more than a few feet from the customs inspection belt when he was approached by Marchesano. Thus, the initial contact by Officer Marchesano should be classified as an extension of the routine inspection conducted by the stationed customs inspectors. *See United States v. Nieves, supra* at 645.

■ Even assuming that the action of Officer Marchesano is deemed to be a secondary customs stop and search, the court finds that the questions posed and the subsequent detention and search qualified as a valid border search. *United States v. Nieves, supra* at 647; *Murgia v. United States,* 285 F.2d 14 (9th Cir. 1960), *cert. denied,* 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961). Here, the defendant was still within the confines of the International Arrivals Building. Indeed, the defendant was in close proximity to the customs inspection belt and only a short time had elapsed after the initial inspection. Accordingly, Officer Marchesano's decision to approach the defendant was proper under the circumstances. *See, e. g., United States v. Glaziou,* 402 F.2d 8 (2d Cir. 1968), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). *See also United States v. Golden,* 532 F.2d 1244 (9th Cir. 1976).

■ Similarly, the subsequent detention of the defendant was an acceptable, routine border inspection which required no justification beyond that provided by the defendant's decision to cross our national boundary. *United States v. Nieves, supra* at 646. It is well established that anyone entering the country may expect to have his luggage and personal effects examined. *United States v. Ramsey, supra,* 431 U.S. at 619, 97 S.Ct. at 1980; *United States v. Asbury, supra* at 975. However, an extensive invasion of privacy must be based upon something more than a border crossing. *United States v. Asbury, supra* at 975.

■ Once inside the private room, the search comported with routine inspection procedures. *See, e. g., United States v. Chase,* 503 F.2d 571 (9th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975). The request to empty the defendant's pockets, to remove his jacket and to undergo a routine pat down would not warrant the imposition of reasonable suspicion. *See, e. g., United States v. Fitzgibbon,* 576 F.2d 279 (10th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Chase,* 503 F.2d 571 (9th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975); *United States v. Stornini,* 443 F.2d 833 (1st Cir.), *cert. denied,* 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971); *Henderson v. United States,* 390 F.2d 805 (9th Cir. 1967).

■ Further, the record clearly indicates that the request to remove the defendant's shirt was supported by reasonable suspicion. *United States v. Nieves, supra.* Once the officer felt the protrusion and a suitable explanation was not forthcoming, a more extensive search was reasonable. *See generally United States v. Asbury, supra; United States v. Smith,* 557 F.2d 1206 (5th Cir. 1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). Specifically, it was significant that the defendant became perceptibly vexed and began to perspire profusely once the officer discovered the protrusion.

■ In the alternative, assuming that the manner of the search went beyond a routine inspection of a person's belongings and effects, the search must be deemed to

be reasonable under the circumstances. *See generally United States v. Asbury, supra* at 976–77. Here, the fast gait, the nervous appearance, the excessive perspiration, the fact that the defendant was in transit to Canada from a source country, and the bulge under the vest, constituted a sufficient set of factors to warrant an extensive search.

 Finally, assuming *arguendo* that the initial contact was at a point beyond the customs area and therefore, the subsequent detention cannot be characterized as a valid border search, the agent's actions were appropriate under the circumstances. Here, as indicated previously, in view of the suspicious factors that were present, the temporary detention did not contravene the requirements of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see generally United States v. Rico [Appeal of Ortiz]*, 594 F.2d 320 (2d Cir. 1979); *United States v. Magda*, 547 F.2d 756 (2d Cir. 1976), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1978). Indeed, the removal to a location more conducive to effective interrogation was permissible under the circumstances. *See United States v. Oates*, 560 F.2d 45, 56 61 (2d Cir. 1977).

Most significantly, it can be argued that the initial contact by Officer Marchesano did not amount to an intrusion upon any constitutionally protected interest. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Using this analysis, the court must still determine whether the Fourth Amendment was violated when the defendant went from the concourse to the private search room. *United States v. Mendenhall, supra*.

 In light of the testimony given by the defendant himself, the court finds that he accompanied the officer voluntarily and in a spirit of cooperation. The record is devoid of any showing of threats or use of force by the officer. On the basis of the totality of the circumstances, the court finds that the defendant's consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

On the basis of the foregoing analysis, the court concludes that it must deny the defendant's motion to suppress the evidence.

So Ordered.