UNITED STATES of America, Appellee,

v.

Charles SANDERS, Appellant.

No. 148, Docket 81–1191.

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1981.

Decided Oct. 23, 1981.

Phylis Skloot Bamberger, Federal Defender Services Unit, The Legal Aid Society, New York City, for appellant.

Brian E. Maas, Asst. U. S. Atty., New York City (Edward R. Korman, U. S. Atty., for the Eastern District of New York, Jane Simkin Smith, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before OAKES and MESKILL, Circuit Judges, and BLUMENFELD,* District Judge.

OAKES, Circuit Judge:

This Fourth Amendment case involves the narrow circumstances of a border search of a reentering citizen's artificial limb. A motion to suppress the fruits of the search—514 grams of cocaine—was denied by the United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, and a plea of guilty to charges of importation, 21 U.S.C. §§ 952(a) and 960(a)(1), was taken. Appellant reserved the right to appeal the denial of his suppression motion. Because the standard for body searches at the border is one of "suspicion of illegal concealment . . . based upon something more than the border crossing, and . . . substantial enough to make the search reasonable" when that suspicion is weighed against "the offensiveness of the intrusion," *United States v. Asbury*, 586 F.2d 973, 975–76 (2d Cir. 1978), and that standard was met here, we affirm.

## FACTS

Appellant, Charles Sanders, arrived on December 7, 1980, at John F. Kennedy International Airport on Viasa Flight 800 from Caracas, Venezuela, and presented himself for inspection to a twenty-four-year veteran customs officer. The officer, routinely entering Sander's name and date of

* Of the District of Connecticut, sitting by designation.

birth into the Treasury Enforcement Computer Systems (TECS) terminal, received the positive response set forth in the margin.[1] While awaiting this response, the officer examined Sanders's passport and found that it was a "Z" passport, i. e., one issued to Americans who are abroad and for one reason or another do not have their regular United States-issued passports.[2] Moreover, Sanders's passport had been issued in Colombia—a well-known, perhaps the prime, source of narcotics for the narcotics trade in the western hemisphere—on July 23, 1980. After a routine luggage search and upon receipt of the TECS information, the customs officer, with another's assistance, took Sanders to a secondary examination room where a pat-down confirmed that Sanders had an artificial leg. They then informed Supervisory Customs Inspector Eva Coakley of the situation at that point.

On examination of the "Z" passport obtained in Colombia, Coakley noted that Sanders' had entered Venezuela from Colombia only three days before he left Venezuela for New York. She also noted that the San Francisco address on his customs declaration conformed to the TECS printout, and that the printout had been entered on November 13, 1978. She directed retrieval of Sanders's airplane ticket and noted that it had been purchased in Venezuela on December 4, had been paid for in cash, and was a round-trip ticket. She then questioned Sanders herself.

He said that he had been in Colombia about a year and had been jailed there after accusation as a black revolutionary. Upon further inquiry he claimed that he had not left Colombia because he had had to report to a parole officer. After he said that his intention was to fly to San Francisco, Coakley asked him why he had a round-trip ticket returning to Venezuela. His explanation was that he had a national (presumably Venezuelan) buy his ticket for him and that as such the national was permitted to buy only a round-trip ticket. Asked why he didn't buy the ticket himself, Sanders stated that he had not had a passport because the judge in Colombia had retained it. This was, of course, incredible to Coakley because the "Z" passport, reflecting Sanders's entry from Colombia into Venezuela on December 4, showed that he had the passport before he purchased the ticket. Sanders's story about the "national's" purchase of the ticket thus seemed false. And his possession of a round-trip ticket, already suspicious given that he said he was going to San Francisco, triggered special suspicion since customs is aware that smugglers often buy round-trip tickets for couriers whose return is expected.

At this point Coakley asked Sanders to remove his artificial leg. Upon his refusal to do so he was taken first to the airport medical center and then to Jamaica Hospital. After being advised that his leg would be removed forcibly unless he complied, he removed the shoe and the pant leg covering the artificial leg, unbuckled the strap around his waist supporting the leg, and, in a doctor's presence, removed the leg. The original customs inspector searched it and removed two packets containing about a pound of cocaine.

## DISCUSSION

 Border searches are, and have always been, sui generis. Neither warrant nor probable cause is essential for such a search, which is presumed reasonable mere-

---

1. NAME = SANDERS/CHARLES
 DOB = 9/13/34
 RACE = N SEX = M HEIGHT 5 10
 WEIGHT 145 HAIR = BK EYE = BR
 PASSPORT = US/J157778
 REMARKS = (CUSTOMS)LO/(1)
 SUBJECT IS SUSPECTED OF TRAFFICKING
 NARCOTICS FROM SOUTH AMERICA—MAY
 CONCEAL COCAINE IN ARTIFICIAL LEG
 CUR ADDR: 271 OAK STREET/SAN FRANCISCO/
 CAUS/91172
 CASES = CUSTOMS, HOLONOO003
 RET DATE = 02/22/81 AGY ACC = C9

2. There was customs testimony that "Z" passports are often used by narcotics smugglers because, as new passports, they do not reveal prior trips taken by the passport holder.

ly by virtue of the person's or thing's entry into our country from the outside. *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). The entry in and of itself constitutes consent to a routine search of one's belongings and effects, as to which, at the border, no subjective expectation of privacy is recognized. *United States v. Nieves,* 609 F.2d 642, 645 (2d Cir. 1979), cert. denied, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980).

More extensive invasions of a person's bodily privacy, however, require great justification. While the Supreme Court has reserved the question when a border search might be deemed unreasonable owing to the offensive manner in which it is carried out, *United States v. Ramsey,* 431 U.S. at 618 n.13, 97 S.Ct. at 1979, our court has held that when a border search extends beyond routine inspection of belongings and effects, "reasonableness is determined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." *United States v. Asbury,* 586 F.2d at 976. For example, before a border official may "strip search" a border crosser, the official must have a "suspicion of illegal concealment that is based upon something more than the border crossing, and the suspicion should be substantial enough to make the search a reasonable exercise of authority . . . [in light of] all the facts of [the] particular case." *Id.* at 975–76.

In determining whether the search of Sanders's leg was reasonable, we must first determine the degree of the intrusion involved. Appellant argues that the removal of an artificial leg for inspection is as intrusive as a body-cavity search. We disagree. True, the exposure of the stump to which the prosthetic device is attached, accompanied by a temporary lack of mobility, constitutes an embarrassment. But done in a medical setting, unaccompanied by exposure of intimate bodily parts, and without physical force,[3] the search here was no more intrusive than the strip search in *Asbury,* and clearly less intrusive than a body-cavity search.[4]

Guided by the *Asbury* balancing test, we must next determine whether the factors creating suspicion here were sufficiently substantial to justify the intrusion that did occur. We believe that they were. Present here was a combination of at least three of the twelve factors listed in *Asbury* that may be taken into account in determining the reasonableness of an intrusive border search: "computerized information" indicating prior suspicion of criminal activity, *see United States v. Kallevig,* 534 F.2d 411, 412, 414 (1st Cir. 1976); "an itinerary suggestive of wrongdoing," *see United States v. Chiarito,* 507 F.2d 1098, 1100 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *United States v. Diaz,* 503 F.2d 1025, 1026 n.1 (3d Cir. 1974); and

---

**3.** While a customs officer did tell Sanders that "the leg is coming off either the hard way or the easy way, so it's up to you," at which point Sanders acquiesced, we do not think that this amounted to coercion rendering the search more offensive than the circumstances required. Indeed, the fact that it was ultimately Sanders, not the customs officers, who removed the leg, albeit upon demand, lessens the degree of the intrusion.

**4.** The Ninth Circuit has a higher standard for body-cavity searches—which require a "clear indication," *Schmerber v. California,* 384 U.S. 757, 769–70, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966), or a "plain suggestion," *Rivas v. United States,* 368 F.2d 703, 710 (9th Cir. 1966), that the suspect is concealing contraband in his body cavity, *see, e. g., United States v. Aman,* 624 F.2d 911, 912–13 (9th Cir. 1980)—than it does for strip searches—which require only

"real suspicion," *see, e. g., United States v. Guadalupe-Garza,* 421 F.2d 876, 879 (9th Cir. 1970). This court and the Fifth Circuit have intimated, without reaching the issue, that body-cavity searches may require a higher degree of suspicion than do strip searches in order to be found "reasonable." *See United States v. Asbury,* 586 F.2d at 976 n.4 (2d Cir. 1978); *United States v. Afanador,* 567 F.2d 1325, 1329 n.3 (5th Cir. 1978), *citing United States v. Himmelwright,* 551 F.2d 991, 996 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). Because we agree with the court below, and indeed with the Ninth Circuit, *see United States v. Carter,* 563 F.2d 1360, 1361 (9th Cir. 1977), that the removal and search of an artificial leg is *not* as intrusive as a body cavity search, we need not reach that issue here.

**4**

"evasive or contradictory answers," *see United States v. Himmelwright*, 551 F.2d 991, 996 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

■ There can be little dispute that Sanders's itinerary and mode of travel conformed with experienced customs officers' profile of a drug courier, and that his misstatement that his ticket had been purchased for him because he had no passport was suspicious. Appellant's strongest argument is that the computer printout that contributed to the suspicion against him was not itself based upon hard fact but only upon another custom officer's earlier suspicion that he "*may* conceal cocaine in [his] artificial leg" (emphasis supplied).

The answer to this argument cannot be that the computer printout played only an insubstantial role in the totality of factors casting suspicion on Sanders, for the printout helped trigger the extended examination that elicited Sanders's contradictory answers and revealed his artificial leg as a potential hiding place.

Rather, we believe that the answer to appellant's argument has three steps. First, the computer printout was itself based on sufficient suspicion to make its entry for future use reasonable. The stipulated facts show that the Houston customs officer who entered the information in the computer in 1978 had had his suspicions aroused by Sanders's itinerary—arrival from Acapulco, Mexico, on a round-trip ticket purchased for cash in Mexico City, following two recent trips to Colombia indicated on a passport found in Sanders's luggage along with a cash-purchased round-trip ticket from Bogota, Colombia, to Mexico City; by Sanders's misstatement about his whereabouts on that trip; and by Sanders's claim that he owned a San Francisco cosmetology school—for which he produced an expired business license, *see United States v. Asbury*, 586 F.2d at 977 (2d Cir. 1978) ("lack of employment or a claim of self-employment" is a suspicious factor).

Second, even if the suspicions of the Houston customs officer were not substantial enough to justify a search of Sanders's

artificial leg the first time, the repetition of a similar suspicious pattern of conduct, coupled with a second fruitless search of Sanders's personal effects, could properly heighten the New York customs officers' suspicions that it was the artificial leg that housed any cocaine or other narcotic drug.

Finally, the computer printout, justifiably relied upon, must be viewed in combination with the other factors present: the "Z" passport (which did not show Sanders's prior Colombian trips), its issuance in Colombia, the rather thinly veiled reentry from Venezuela (not a source country) rather than Colombia (*the* source country), the purchase in cash of a round-trip ticket, and the lie to Coakley about why Sanders had the sort of ticket he did.

In short, weighing the intrusiveness of this search against the totality of circumstances justifying it when it was made, we find sufficient substantial suspicion above and beyond mere border entry to make it reasonable. *United States v. Asbury*, 586 F.2d at 975–76.

Judgment affirmed.