### UNITED STATES of America
### v.
### Paul SOLIMINI, Defendant.
### No. 82 CR 584.

United States District Court,
E.D. New York.

March 31, 1983.

---

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for U.S.; Peter A. Chavkin, Asst. U.S. Atty., Brooklyn, N.Y., of counsel.

George L. Santangelo, New York City, for defendant.

BARTELS, District Judge.

Defendant Paul Solimini moves to suppress certain statements and physical evidence in connection with his indictment for importing and possessing with intent to distribute cocaine. The following findings of fact, and attendant conclusions of law, are based on testimony elicited and exhibits introduced in evidence at the suppression hearing held on February 16, 1983.

## FACTS

### A

On November 24, 1982, at 5:15 P.M., Solimini arrived at John F. Kennedy International Airport on Avianca Flight 004 from Bogota, Colombia. Solimini proceeded to the Customs baggage retrieval area in the Pan American terminal to pick up the one piece of luggage that he had checked in. There, United States Customs Inspector Anthony Contorno approached Solimini for questioning. Contorno was a member of a special Customs Enforcement Team ("CET") assigned to scrutinize passengers arriving from narcotics source countries and examine those suspected of smuggling narcotics. According to Contorno, his suspicions became aroused because Solimini had arrived alone from Colombia with only one piece of luggage and appeared to be neither a tourist nor a businessman.

Contorno first asked to examine Solimini's passport, Customs declaration, and flight ticket. From the documents he learned that Solimini was a United States citizen returning from a three-day trip to Colombia; that he had obtained his passport on November 19, 1982 (two days prior to his departure from the United States); and that he had purchased his ticket for $764.00 cash on November 18, 1982. Solimini had nothing to declare and accordingly Contorno questioned him about the purpose of his trip, to which Solimini responded that he had visited a friend for three days.

Contorno then directed Solimini to accompany him to a nearby private examination room where they were joined by Customs Inspector Michael Moore, supervisor of the CET. Contorno patted down Solimini and searched his suitcase without finding tourist souvenirs, business documents, or any evidence of contraband. In response to further questioning, Solimini told Contorno and Moore that his girlfriend—whose name and address he could not remember[1]—had called him a week before his trip inviting him to visit. Solimini stated that he had met the girlfriend while walking about the World Trade Center in New York City but he had not heard from her for a year prior to her call. He further explained that he had been unemployed for three years; that his father, a truck driver, had paid for his flight ticket; that he had returned after only three days to be with his parents on Thanksgiving (November 25th); that he intended to visit his girlfriend again; and that he could not remember the name or approximate cost of the hotel where he had stayed his first night in South America. Contorno noticed that Solimini acted very nervously throughout the questioning, tap-

---

1. Moore testified at the suppression hearing that Solimini said that he could not recall his girlfriend's name because he was nervous.

ping his foot, licking his lips, clenching his fist, and clearing his throat, and Moore noticed perspiration on Solimini's forehead.

At this point both inspectors suspected that Solimini was carrying drugs internally, and directed him to lower his trousers and underwear. They discovered fresh excrement stains on his underwear and Moore saw excrement in Solimini's anal area when he bent over and spread his buttocks. Based on their past experiences with internal drug smuggling and the indications thereof,[2] this discovery reinforced their suspicion that Solimini had either ingested narcotics or inserted them into his rectum. They advised him of their suspicion and presented a consent form authorizing abdominal x-rays, which Solimini read and refused to sign. Contorno then read to Solimini his *Miranda* rights which, according to Contorno, Solimini orally waived. Joined by Customs Inspectors Alschuler and Hauck, Contorno took Solimini from the examination room to a Customs van parked several hundred feet from the building exit. Contorno noticed that in walking to the van Solimini exhibited an unusual gait as he tightened his buttocks as if trying to prevent a bowel movement. The three inspectors then drove Solimini to Jamaica Hospital, located three miles away, for observation and, apparently, x-rays even though Solimini had refused to sign a consent form. The inspectors did not converse with Solimini during the ten-minute drive.

### B

Upon arrival at the hospital shortly before 7:00 P.M. Solimini refused to submit to an x-ray examination. Even after a doctor explained to him the dangers of carrying narcotics internally, Solimini refused to give admittance information or have his vital signs taken. Approximately one hour after arrival at the hospital, Solimini was admitted and taken by the inspectors to a room where, upon their direction, he undressed himself, put on a hospital gown, and got into a bed to which he was then handcuffed. Sometime before Contorno's departure at 9:15 P.M., Solimini asked to call his parents and was permitted to do so.[3] Solimini did not request to speak with an attorney.

For three hours—8 P.M. to 11:00 P.M.—Solimini remained in bed while the inspectors awaited his bowel movement. The only questioning of Solimini was by doctors attempting to elicit medically-related information. Shortly before 11:00 P.M., Solimini asked Alschuler, hypothetically, what legal consequences would follow should he be found to be carrying drugs, to which Alschuler stated he could give no such advice.[4] At 11:00 P.M. Solimini requested to be permitted to have a bowel movement and he excreted seventeen rubber packets containing white powder. After a field test indicated positive for cocaine, Alschuler formally arrested Solimini and read his *Miranda* rights. Soon thereafter Solimini's attorney—contacted by Solimini's parents—called the hospital and spoke with Solimini. Sometime within an hour after his arrest Solimini told Alschuler that while on the plane prior to landing he had excreted several rubber packets and had reswallowed them after cleaning them.

### C

The following day while still in the hospital Solimini volunteered to Customs Inspec-

---

2. Contorno testified that in his eight years as an inspector at the airport he had previously stopped ten internal drug smugglers and that he had also received formal training as to their detection. He had seen excrement stains ultimately connected with internal smuggling five times previously.

Moore, with twelve years experience, testified similarly except that he had personally intercepted five internal drug smugglers and only one or two of them had excrement stains on their underwear.

3. Solimini was permitted to call his parents shortly after his arrival at the hospital but was unable to get through.

4. Alschuler testified that at some point Solimini stated that he had ingested 76 packets containing 175 grams of cocaine. Whether this occurred before or after the 11:00 P.M. excretion is not clear, although Moore testified that he had received a phone call from one of the inspectors prior to 11:00 P.M. relating that Solimini had told the inspector that he had swallowed cocaine packets.

tor Baach that he was anxious to get the whole affair over with and that he had secreted four packets of cocaine in a sock in his suitcase, which Baach subsequently recovered.

A magistrate arraigned Solimini by telephone on November 26th, the previous day having been the Thanksgiving holiday. Over the three days Solimini remained in the hospital,[5] he excreted a total of 172 packets of cocaine.

## DISCUSSION

Border searches "are, and have always been, sui generis. Neither warrant nor probable cause is essential for such a search, which is presumed reasonable merely by virtue of the person's or thing's entry into our country from the outside." *United States v. Sanders*, 663 F.2d 1, 2–3 (2d Cir. 1981); *see also United States v. Moody*, 649 F.2d 124, 127 (2d Cir.1981). The examination of Solimini by Moore and Contorno up to but not including the strip search constituted a routine border inspection presumptively reasonable. *See United States v. Grotke*, 702 F.2d 49 at 51 (2d Cir.1983); *United States v. Sandler*, 644 F.2d 1163, 1169 (5th Cir.1981); *United States v. Asbury*, 586 F.2d 973, 975 (2d Cir.1978); *United States v. Holtz*, 479 F.2d 89, 93 (9th Cir.1973); *United States v. Luc-Thirion*, 501 F.Supp. 875, 879 (E.D.N.Y.1980).

However, a more restrictive standard is applied in scrutinizing invasions of a person's privacy that go beyond routine questioning and inspection of personal belongings and effects. In such cases reasonableness is determined "by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." *United States v. Asbury*, 586 F.2d at 976. Specifically addressing the reasonableness of strip searches, the Second Circuit has stated:

Before a border official may "strip search" a border crosser, the official must have a "suspicion of illegal concealment that is based upon something more than the border crossing, and the suspicion should be substantial enough to make the search a reasonable exercise of authority ... [in light of] all the facts of [the] particular case."

*United States v. Sanders*, 663 F.2d at 3 (quoting *United States v. Asbury*, 586 F.2d at 975–76).

Contorno and Moore knew from Solimini's travel documents and answers to routine questioning that he had travelled alone to a country well known as a source of cocaine, *see United States v. Sanders*, 663 F.2d at 4, for only three days. In addition to this itinerary suggestive of wrongdoing, they knew that Solimini, who professed to be unemployed for three years, had purchased his airline ticket for $764.00 cash and obtained his passport shortly before his trip,[6] and that he had taken only one piece of luggage with him.

Solimini's patently incredible story about visiting a girlfriend in Colombia whose name and address he could not recall and who had telephoned him from Colombia after a one-year hiatus certainly warranted suspicion of wrongdoing. *See United States v. Rodriguez*, 592 F.2d 553, 555, 556 (9th Cir.1979). Almost as incredible was his assertion that he had returned from Colombia—having left the United States only three days earlier—to be with his parents on the following day, which was Thanksgiving.

Finally, Solimini's manifest nervousness during questioning in the private examination room—perspiring, tapping his foot, licking his lips, and clearing his throat—justifiably heightened the inspectors' suspicions of drug smuggling. *See United States v. Luc-Thirion*, 501 F.Supp. at 880.

---

5. Alschuler testified that it was Customs policy to retain internal drug carriers in the hospital until the carrier had two bowel movements free of packets.

6. By obtaining a new passport in this manner a drug courier is able to conceal prior trips between source countries and the United States. *See United States v. Sanders*, 663 F.2d 1, 2 n. 2 (2d Cir.1981); *United States v. Carter*, 590 F.2d 138, 140 (5th Cir.1979).

The leading case on the subject of strip searches by border officials is *United States v. Asbury,* which sets forth the various factors that may support a reasonable suspicion of illegal concealment justifying a strip search. 586 F.2d at 976–77. These include excessive nervousness, unusual conduct, an itinerary suggestive of wrongdoing, lack of employment, inadequate luggage, and evasive or contradictory answers. Moreover, in gauging the reasonableness of their suspicion of illegal concealment, the court must view the totality of circumstances presented to the border officials and not any single factor in isolation. *Id.* at 977; *see United States v. Forero-Rincon,* 626 F.2d 218, 222 (2d Cir.1980). So viewed, and finding the above-enumerated factors present in the instant case, the court concludes that Contorno and Moore had sufficient basis to reasonably suspect that Solimini was carrying drugs, thereby justifying the strip search.[7] Thus, the discovery of excrement stains on Solimini's underwear and anal area as a direct result of the strip search was also lawful and reasonable. Obviously, such a discovery entails no more intrusiveness than the strip search itself, and the court is not faced with application of the more restrictive standard relating to body-cavity searches. *See United States v. Sanders,* 663 F.2d at 3 n. 4; *United States v. Asbury,* 586 F.2d at 976 & n. 4; *United States v. Clymore,* 515 F.Supp. 1361, 1367 (E.D.N.Y. 1981).

■ Under the circumstances the inspectors acted justifiably and prudently in transporting Solimini to nearby Jamaica Hospital for x-rays and observation. Defendant argues that the border search lost its character as such and became an arrest requiring probable cause when he was brought to the hospital and detained there. This is a misconception of the authority of border officials in connection with a person's entry into the country. In fact, the arrest did not take place until after the first excretion of cocaine-filled packets in the hospital later that evening.

Defendant's detention-as-arrest argument is put to rest by *United States v. Sanders,* 663 F.2d 1 (2d Cir.1981). There border officials detained the defendant at Kennedy airport upon suspicion of secreting cocaine in his artificial leg. When he refused to remove his artificial leg for inspection, the officials transported him to Jamaica Hospital where, in a doctor's presence, he removed the leg within which cocaine was found. Although the court did not specifically address the argument defendant raises here, its application of the balancing test applicable to border searches, *id.* at 3–4, rather than probable-cause analysis, clearly indicates the inapplicability of the latter under the present circumstances. Indeed, in discussing the degree of intrusion · involved the court noted that the medical setting mitigated the search's intrusiveness. *Id.* at 3. The same can be said here with even greater force since there existed a danger that one or more of the drug-containing packets would rupture, thereby endangering Solimini's life. *See United States v. Aman,* 624 F.2d 911, 913 (9th Cir.1980); *Blefare v. United States,* 362 F.2d 870, 873–74 (9th Cir.1966). In *Blefare v. United States* the court upheld as an extended border search the transportation of two persons suspected of carrying drugs internally to a doctor's office twelve miles from the border where emetics and tubes were used to recover drug packets in their stomachs.

■ Solimini's four-hour detention for observation at the hospital while the inspectors awaited his first bowel movement was reasonable under the circumstances. *See United States v. Couch,* 688 F.2d 599, 603 n. 5 (9th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 128, 74 L.Ed.2d 110 (1982). Conse-

---

7. *United States v. Asbury,* 586 F.2d 973 (2d Cir.1978), nowhere suggests that the factors listed therein may only provide the basis for a reasonable suspicion of carrying drugs *on* a person's body rather than internally. *Cf. United States v. Couch,* 688 F.2d 599, 603 (9th Cir.),

*cert. denied,* — U.S. —, 103 S.Ct. 128, 74 L.Ed.2d 110 (1982). That Contorno and Moore suspected internal drug carrying prior to strip searching Solimini, therefore, does not affect the court's analysis.

654

quently, the first seventeen packets of cocaine excreted were lawfully seized and Solimini's arrest was also lawful. Once arrested upon probable cause, further detention at the hospital was clearly warranted in light of Solimini's voluntarily-given statement that he had ingested in excess of seventeen packets and the continuing health hazard posed by the presence of cocaine in his digestive tract. Thus, all 172 packets of cocaine excreted by Solimini were lawfully seized.

■ The court finds that none of Solimini's other statements was the product of coercion or unlawful interrogation. To the contrary, Alschuler credibly testified that the hypothetical question asked by Solimini shortly before his first bowel movement and his statement about reswallowing several prematurely-excreted packets while on the plane were voluntarily given. Indeed, the latter statement came within an hour of Solimini being read his *Miranda* rights for the second time. Finally, the court is satisfied that Solimini's statement on November 25th to Baach concerning the four packets hidden in his suitcase was also voluntarily given.

On the basis of the foregoing, Solimini's motion to suppress physical evidence and statement is denied.

SO ORDERED.