Gustavo Bolivar **VELEZ**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**No. 83 Civ. 7021 (TPG).**

United States District Court,
S.D. New York.

Aug. 25, 1988.

---

**52**

Stephen A. Weingrad, Weingrad & Weingrad, P.C., New York City, for plaintiff.

Noel A. Ferris, Sp. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., New York City, for defendant.

## OPINION

GRIESA, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–80. The action has been tried to the court without a jury. This opinion constitutes the court's findings of fact and conclusions of law.

## FACTS

In the early 1980's the United States Government became aware of a novel technique of drug smuggling into the United States, involving the swallowing of drug-filled balloons which are carried internally and then passed through the bowels after entry into the United States. The Customs Service instituted procedures to deal with this problem. An entrant would subjected to an initial screening process. If there was reasonable suspicion that drugs were being smuggled internally, the entrant would be x-rayed at a hospital. If the x-ray indicated the presence of foreign bodies, the person would be detained in the hospital until drugs were passed or until it appeared clear that there were no drugs.

One of the locations where this program was carried out was Kennedy Airport in New York City. During the period from April 1, 1982 to the time of the incident involved in this case, 75 persons were taken from Kennedy to a hospital for x-rays; in 50 of these cases the x-rays were positive; in 46 drugs were found.

On September 28, 1982 plaintiff Gustavo Velez, a Columbian national, arrived at Kennedy Airport from Columbia. Velez had stopped in Miami on his way to New York and had stayed there overnight. He had gone through customs in Miami, and was required to do so again at Kennedy because he had continued on an international flight. At Kennedy he was questioned by Customs Inspector Richard Alschuler. This process commenced at 6:50 p.m. Velez had a proper passport and a tourist visa allowing him to remain in the United States for 10 days Velez's passport showed that during the previous 3½ years he had made 13 trips to the United States, mostly of short duration. He had purchased his ticket for cash in Columbia two or three days before the flight.

Alschuler proceeded to ask Velez certain questions. He asked Velez why he had stopped in Miami. Velez did not answer. Alschuler asked why Velez was travelling to the United States. He stated that he had a factory in Columbia which manufactured leather goods and that he was coming to the United States to buy parts for sewing machines. Alschuler asked if his previous trips had all been for business and Velez replied that they had been. The in-

spector asked what firms he had conducted transactions with on the previous trips and Velez made no reply. Alschuler asked Velez to identify the firm he was doing business with on this trip. Velez either did not respond or said that he did not know. The inspector asked where he was staying on this trip and Velez replied that it was in a hotel. When asked the name of the hotel, Velez either did not answer or said that he did not know. When asked the names of hotels where he had stayed previously, Velez did not answer. Alschuler asked about his income and Velez stated that he earned approximately $1,000 a month. This led Alschuler to ask how he could afford 13 international trips in such a short time. Velez did not respond. Velez indicated that he was carrying approximately $1,300 in cash with him.

Alschuler and another Customs Inspector, Moculeski, took Velez to a room where he was given a pat-down search, and a "more thorough" search, but not apparently a strip search. These searches did not produce any contraband.

Based on the circumstances as a whole, Alschuler was of the opinion that Velez was probably carrying narcotics internally.

Although Alschuler had some ability in Spanish and had questioned Velez in Spanish, he called in a Pan Am employee who was more proficient in that language, and had the questioning repeated. Velez gave essentially the same responses. Alschuler then conferred with his supervisor, who authorized the use of the x-ray and follow-up procedures.

Velez was asked to consent to an x-ray. He declined to do so.

Pursuant to an arrangement which the Customs Service had with the nearby Jamaica Hospital, Alschuler and Moculeski took Velez to that hospital the night of September 28. They arrived at the hospital about 8:30 p.m. The doctor on duty in the emergency room took an x-ray and interpreted it as disclosing probable foreign bodies in the ascending colon. No force was used in obtaining the x-ray.

It was the procedure of the Customs Service, where the x-ray appeared positive for foreign bodies, to detain the person at the hospital, under continuous guard by Customs Service officers, and wait to see if any narcotics were passed in a bowel movement. If a bowel movement occurred in which no narcotics were passed, a second x-ray would be taken. If the second x-ray was negative, the person would be released. If the second x-ray was positive for foreign bodies, further steps would be taken to determine positively whether or not narcotics were being smuggled.

Since the initial x-ray in the present case was interpreted as positive, Velez was detained and placed in a hospital room. During his stay he was monitored by the medical staff of the hospital and was under continuous guard by Customs Service personnel.

The hospital records show that Velez had a bowel movement at about 2:00 p.m. September 29. No narcotics were passed. A second x-ray was taken on September 29, although the hospital record does not show exactly what time this occurred, nor were any records kept by the Customs Service which show the time of this x-ray or any other event occurring at the hospital. The court infers, however, that the x-ray of September 29 was taken in the afternoon after the bowel movement. This second x-ray was negative for foreign bodies.

Under Customs Service procedure, Velez should have been released no later than the afternoon of September 29. A supervisory customs officer, who was not involved in this case but who was called as a witness by the Government to explain the procedures, stated that Velez should have been released following the negative x-ray of September 29. This was not done. Velez was detained in the hospital for almost another two days and nights and was not released until the morning of October 1.

It is necessary at this point to relate further facts regarding the initial emergency room x-ray. No radiologist was on duty the evening of September 28, when the initial x-ray of Velez was taken. The doctor on duty in the emergency room read the x-ray as positive for foreign bodies, but

this was only a tentative reading. A radiologist was needed to give a definitive interpretation. A radiologist came on duty at the hospital commencing at 8:00 o'clock the next morning, September 29. The x-ray should have been given to the radiologist at that time. Due to the neglect of both the hospital and the Customs Service, the initial x-ray was not given to a radiologist until sometime September 30. At that time the radiologist interpreted the initial x-ray as negative for foreign bodies. It has been stipulated in court that this interpretation was correct and that the x-ray in fact showed no foreign bodies.

Velez does not claim fault on the part of the emergency room doctor in making his tentative interpretation, nor does Velez contend that the Customs Service was at fault in relying at that time upon the reading of the doctor. However, reasonable and proper procedures required that a radiologist review the doctor's findings at the earliest possible time. This could have been done, and should have been done, early in the morning of September 29. Had the radiologist reviewed the x-ray at that time, he would have found it to be negative, and Velez would have been released that morning.

Moreover, as already described, Velez should have been released at the very *latest* the afternoon of September 29, following the negative bowel movement and the negative x-ray of that date.

There is no satisfactory explanation whatever as to why Velez was kept in the hospital until the morning of October 1. Other customs officers succeeded Alschuler the morning of September 29 and stayed with Velez at the hospital until he was released. None of these succeeding officers were called to testify and apparently they kept no records. As far as the hospital record is concerned, it contains no reference to any consultation or deliberation following the negative bowel movement and x-ray of September 29. There is no record of any consideration being given to Velez's release at that time. There is no indication as to why it was necessary or appropriate to keep him longer.

From the afternoon of September 29 until Velez's release the morning of October 1, the hospital record contains no notation of any observations or symptoms indicating even the possibility of the presence of smuggled drugs in Velez's body. There is some confusion as to whether Velez had any further bowel movements after 2:00 p.m. September 29. In any event, no drugs were passed. On September 30 two final x-rays were taken, which were negative as to foreign bodies. Also, as already described, on September 30 the radiologist read the initial September 28 x-ray as negative. Still Velez was not released. He was not allowed to leave the hospital until the following morning, October 1. There is no explanation as to what event precipitated his release at that time.

Velez suffered no physical injury of substance as a result of the detention and hospitalization, although he was subjected to some discomfort as a result of hospital procedures, particularly the drawing of blood. In an apparent effort to induce bowel movement, the nurses sought to have him take mineral oil. At first he refused, but finally took it in the early morning of September 29 and twice again on September 30.

Velez testified that he experienced nervousness and fright following the incident. He also testified that he suffered with diarrhea for about a year after the hospitalization.

It is reasonable to conclude that Velez experienced some nervousness and fear as a result of his being detained in the hospital under guard and against his will for two days and two nights beyond the relatively short confinement which was permissible. Also, the court accepts the testimony about diarrhea to the extent of concluding that Velez had a mild case for a short time. However, there is no substantiation for any claim of long-standing or serious diarrhea.

There is no basis in the evidence for any finding of economic loss by way of lost earnings from business.

## DISCUSSION

Originally this action was brought against several defendants, but by the time

of the trial, the action had been limited to a Federal Tort Claims Act claim against the United States. The tort theories relied upon are false arrest, false imprisonment, and assault and battery. It is claimed that Velez was falsely arrested when he was stopped and subjected to the various procedures at Kennedy Airport. It is claimed that he was falsely imprisoned when he was detained at Kennedy and thereafter at Jamaica Hospital. It is claimed that he was subjected to assault and battery when he was compelled to submit to various medical procedures at the hospital.

As originally enacted, the Federal Tort Claims Act did not allow claims for false arrest, false imprisonment, assault or battery. However, the statute was amended to provide that an action could be brought for these torts "with regard to acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h).

The substantive liability of the United States under the statute is governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). It is necessary to look to the "whole law" of the state where the incident took place. *Caban v. United States*, 728 F.2d 68, 72 (2d Cir.1984). In connection with law enforcement activities analogous to those involved in the present case, the Second Circuit has held that New York would look to federal law in judging the conduct of the law enforcement officials. *Id.* at 73. Thus, the issue in the present case is whether the Customs Service acted within its lawful authority under federal law in acting as it did.

This issue breaks down into two questions: *First,* was it lawful and proper to subject Velez to x-ray and follow-up procedures at Jamaica Hospital? *Second,* even if the initial x-ray and some follow-up was proper, was Velez detained for an excessive length of time?

The relevant statute regarding customs searches is 19 U.S.C. § 1582, which provides that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government," under regulations prescribed by the Secretary of the Treasury.

The Customs Service is an agency under the Department of the Treasury, and Title 19 of the Code of Federal Regulations deals with the Customs Service. 19 C.F.R. § 162.6 provides that all persons, baggage and merchandise arriving in the United States "are liable to inspection and search by a Customs Officer."

These general provisions are implemented in various directives promulgated by the Customs Service, including the Policies & Procedures Manual and the Customs Inspector Handbook. Section 9.12.1 of the Customs Inspector Handbook has certain guidelines about personal searches, which are not relevant to the present action. The directive which is relevant here is the Manual Supplement dated April 23, 1982 to the Policies & Procedures Manual.

This Manual Supplement calls attention to the increasing incidence of narcotics smuggled in the body, where even a careful strip search will not reveal evidence of the contraband. It provides that where there is "real suspicion" of internal smuggling an x-ray may be taken. "Real suspicion" is defined as "subjective suspicion supported by objective articulable facts that would lead an experienced, prudent Customs Officer to suspect that a traveler was concealing something on or in his body." The Manual Supplement provides that a written consent for such an x-ray should be requested, but that the Customs Officer on duty has the authority to arrange for the x-ray even if consent is refused. The entrant should be taken to a medical facility for the x-ray. It is provided that, if there is resistance, reasonable force can be used.

The April 1982 Manual Supplement contains no provisions specifying what is to be done following the taking of the x-ray. However, according to the testimony of a supervisory Customs Service officer, certain unwritten procedures were understood to be in effect at the time of the incident involved in the present case. Under these procedures a positive initial x-ray would lead to detention in the medical facility to

await the results of one or more bowel movements. If a bowel movement occurred which was negative, a second x-ray would be taken. If this x-ray was negative, the person would be released. If it was positive, the person could be further detained. The unwritten procedures here described were essentially codified in a Manual Supplement issued April 22, 1983.

Several cases have dealt with what is referred to as "alimentary canal smuggling." *United States v. Montoya*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), was a criminal case presenting the question of whether certain drugs had been seized in violation of the Fourth Amendment. Montoya arrived at the Los Angeles Airport from Colombia. Inquiry by customs officers led them to suspect that Montoya was smuggling drugs internally. She was held at the airport for 16 hours, during which time there was discussion about having her x-rayed. She claimed to be pregnant and the decision about an x-ray was deferred. During her detention, she quite evidently resisted having a natural bowel movement. Finally, pursuant to the order of a federal magistrate, a physician conducted a rectal examination and recovered a "balloon" containing a foreign substance. Shortly thereafter she had a bowel movement and passed additional balloons. The balloons were tested and found to contain cocaine.

The Supreme Court held that Montoya's rights were not violated. The Court noted that *routine* searches of entrants are not subject to any requirement of reasonable suspicion or probable cause. *Id.* at 538, 105 S.Ct. at 3309. Customs officers may go *beyond* the scope of a routine search if, considering all the known circumstances, they reasonably suspect that the traveller is smuggling contraband internally. *Id.* at 541, 105 S.Ct. at 3310. The "reasonable suspicion" standard requires that the officials must have a "particularized and objective basis" for suspecting the internal smuggling. *Id.* at 541–42, 105 S.Ct. at 3310–11.

The Court held that under the facts of this case, there was reasonable suspicion of internal smuggling and that the actions of the customs officers were reasonable, including holding the defendant for 16 hours. The Court stated:

> Her detention for the period of time necessary to either verify or dispel the suspicion was not unreasonable.

*Id.* at 544, 105 S.Ct. at 3312. Since no x-ray was taken of Montoya, nor was she subjected to a strip search or a body cavity search, the Court specifically stated that it was not deciding "what level of suspicion" is required for strip, body cavity, or involuntary x-ray searches at the border. *Id.* at 541 n. 4, 105 S.Ct. at 3310 n. 4.

The subject of alimentary canal smuggling was addressed by the Second Circuit in *United States v. Reyes*, 821 F.2d 168 (2d Cir.1987). This again was a criminal case in which the issue was the admissibility of evidence. The defendants arrived at Kennedy Airport from Colombia. As a result of questioning and inspection of travel documents, the customs officer suspected internal smuggling of drugs. X-rays were taken, to which the defendants consented. The exact course of events following the x-rays is not described in the opinion, but whatever procedures were carried out revealed internally smuggled cocaine. The court held that the drugs were properly admitted into evidence.

The court stated that it did not need to reach the question of whether an x-ray examination without consent would be proper. The court noted cases in the Fifth, Eighth and Eleventh Circuits approving unconsented x-ray, under appropriate circumstances. The court also cited a Ninth Circuit case for a somewhat different view. The Second Circuit stated that it would "defer ruling on this issue until another day, when the matter is squarely before us." *Id.* at 171.

The rule of the Fifth, Eighth and Eleventh Circuits is that, where reasonable suspicion of internal drug smuggling exists, an x-ray can be taken, even without consent, provided that no physical force is used. *United States v. Mejia*, 720 F.2d 1378, 1381–82 (5th Cir.1983); *United States v. Oyekan*, 786 F.2d 832, 837 (8th Cir.1986);

*United States v. Saldarriaga–Marin*, 734 F.2d 1425, 1428 (11th Cir.1984). The Ninth Circuit, in a decision pre-dating *Montoya*, held that an x-ray without consent can be taken only upon "a clear indication" or "plain suggestion" that the person is carrying contraband within his body. *United States v. Quintero–Castro*, 705 F.2d 1099, 1100 (9th Cir.1983).

In an Eastern District of New York case, Judge Bartels held that where there was reasonable suspicion of smuggling drugs in the body, customs officers acted properly in transporting a person from Kennedy Airport to Jamaica Hospital for x-ray and observation, despite the fact that the person had refused to consent to an x-ray. As it happened, some drugs were excreted prior to the taking of an x-ray. The person was detained at the hospital for another three days while the rest of the drugs were passed. *United States v. Solimini*, 560 F.Supp. 648 (E.D.N.Y.1983).

It is now necessary to apply the rules of these decisions to the present case.

■ The court holds that there was reasonable suspicion that Velez was smuggling drugs in his body. He came from a country, Colombia, which is a prime source of cocaine. He was here for a short stay. Although he described generally a legitimate business objective for his trip, he could not identify the party with whom he planned to do business and could not state specifically where he planned to stay. He had travelled frequently to the United States in recent years, but would not identify anyone with whom he had done business. His stated income did not seem to justify international travelling of this frequency. He had about $1,300 in cash with him. He could not explain why he had stopped in Miami on his way to New York. The search of his person was inconclusive.

The court holds that it was within the lawful authority of the Customs Service to take Velez to Jamaica Hospital and have him x-rayed, despite the fact that he did not consent. No force was used in obtaining the x-ray, so that the court need not rule on the question of whether force may be used.

The x-ray was promptly read by a physician who interpreted it as showing probable foreign bodies. Thereafter, the reasonable, and indeed inevitable, procedure was to detain Velez in the hospital until the question about internal smuggling of narcotics was resolved.

It must be emphasized that in such a circumstance the Customs Service has a most serious responsibility. The Service is depriving a person of liberty. It is subjecting a person to certain medical procedures, which, even though not severe, are nevertheless of a nature not normally imposed on people against their will.

The Customs Service can avail itself of the expertise of the hospital staff as appropriate, but the Service must keep control of the situation to make sure that the hospital takes the steps—and takes them promptly—which are necessary to resolve the question about internal narcotic smuggling. The Customs Service must continually monitor what is occurring with the detained person and must, at each stage, evaluate the available information and determine whether further detention is called for or whether the person should be released. It would appear obvious that the customs officers on duty should keep a running record of relevant events such as x-rays and bowel movements.

■ In the present case, following the initial x-ray of September 28 and its reading by the emergency room doctor, the customs officers should have made sure that this x-ray was interpreted by a radiologist as soon as possible, which in this case was 8:00 o'clock the next morning or shortly thereafter. If this had been done, the correct interpretation (negative) would have been disclosed. At that point the Customs Service would have been required to release Velez. No valid excuse has been shown for the delay until the following day in having the initial x-ray reviewed by a radiologist. It should be reiterated that this was not merely a failure on the part of the hospital, but a failure by the Customs Service.

Referring to the language of *United States v. Montoya, supra* 473 U.S. at 544,

105 S.Ct. at 3312, the "period of time necessary to either verify or dispel the suspicion" of internal drug smuggling ended the morning of September 29. The detention for two days thereafter, until the morning of October 1, constituted false imprisonment.

The problem was compounded by the fact that evidence was actually obtained the afternoon of September 29 which, according to the Customs Service's own admission, required the release of Velez.

■ Velez is entitled to damages for false imprisonment for the two-day period from the morning of September 29 to the morning of October 1. The principal element of damages is the loss of freedom, although the court also takes into account, to a modest degree, the fear and nervousness and the diarrhea suffered as a result of the detention. Under all the circumstances, the court awards the sum of $25,000.

■ The cause of action for false arrest is dismissed. As to the cause of action for assault and battery, this refers to the physical contacts with Velez by the hospital staff in carrying out the various procedures. To the extent that these procedures occurred while Velez was properly detained, the procedures were proper. To the extent that they occurred after Velez should have been released, they were part and parcel of the improper detention. They did not rise to the level of separate torts of assault and battery. Velez was not beaten or mistreated. The cause of action for assault and battery is dismissed.

Velez has moved for attorney's fees. This matter has not been completely presented and will be handled in a subsequent proceeding. The judgment will be entered when that proceeding is completed.

SO ORDERED.