Bosede **ADEDEJI**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 87–3120–G.**

United States District Court,
D. Massachusetts.

Jan. 23, 1992.

Charles R. Capace, Michael Avery, Boston, Mass., for plaintiff.

Nancy Watson, Ficksman & Conley, Boston, Mass., for Winthrop Hosp., Inc.

Paul Levenson, Asst. U.S. Atty., Boston, Mass., for U.S.

## MEMORANDUM OF DECISION [1]

GARRITY, District Judge.

Plaintiff Bosede Adedeji alleges that, upon returning to Logan Airport from a trip to Nigeria in May, 1986, United States customs inspectors subjected her to a strip search, X ray examination and body cavity searches without having reasonable suspicion that she was carrying contraband. Plaintiff also makes common law allegations of false imprisonment and assault and battery against the United States in connection with these searches.

### I. Procedural History

The original complaint named as defendants four customs officials: Inspectors Byrd, Manning, Best and Anderson [2]; the physician who performed the body cavity searches, Dr. Oppenheim; and Winthrop Hospital, where the body cavity searches were performed. Plaintiff brought a *Bivens* [3] claim against Dr. Oppenheim and each of the customs inspectors named as

---

**1.** The substance of this memorandum was dictated in open court at the conclusion of the trial and has since been edited and revised, though not in essential respects.

**2.** Supervisor Inspector Norton was also originally named as a defendant. He has since died, and, therefore, is no longer a party to this case.

**3.** *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (allowing constitutional tort claims to be brought against individuals acting under the color of federal law).

defendants. In addition, Plaintiff brought a claim against the United States under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346. The complaint also included counts for medical malpractice and assault and battery against Dr. Oppenheim and Winthrop Hospital. After hearing, the Court allowed a motion of the Plaintiff to amend the complaint by adding, under section 1346(b) of the FTCA, a violation of the Massachusetts Civil Rights Act ("MCRA"), 12 Mass.G.L. c. 12, §§ 11H and 11I.[4]

■ After the case was called for trial and just before jury selection, the parties stipulated that the *Bivens* claims against the individual customs inspectors be dismissed and the case against the United States go forward only on the basis of the FTCA and common law claims. The defendants Dr. Oppenheim and Winthrop Hospital chose to retain their right to a jury trial under *Bivens,* so their case was severed to be tried at the completion of this case.[5] Under the FTCA, there is no right to a jury trial. The Court, therefore, proceeded to hear the surviving instant case against the United States without a jury.

One other item in the history of the case should be mentioned: the judge to whom the case was originally drawn ruled that expert testimony would not be admitted because it would unnecessarily complicate the dispositive issues. That ruling was reargued at some length before this Court, and the prior ruling was reaffirmed, generally disallowing expert testimony. Even so, much of the testimony proffered by the Government concerning the training, practices and procedures of the Customs Department included expert testimony which was accepted into evidence by that route.

## II. Factual Background

In 1986, Plaintiff was a Nigerian citizen and had been a legal permanent resident of the United States since 1972.[6] She is a registered nurse and a very bright woman, as attested to by the bachelor's and master's degrees that she received prior to 1985. Her proficiency as a worker and reliability prior to this incident were established through testimony by Nancy Russo, her supervisor at the Massachusetts Osteopathic Medical Center where she worked in May of 1986.

On May 12, 1986, Plaintiff returned to Boston, Massachusetts after a six day visit with her family in Lagos, Nigeria[7] using the first half of a round trip ticket she had purchased in Nigeria the day before in

---

**4.** 28 U.S.C. § 1346(b) gives the district courts exclusive jurisdiction of civil actions on claims against the United States for money damages for personal injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." In this case, the wrongful act or omission occurred in Massachusetts. Hence, the Plaintiff brought her claim under the MCRA.

Sections 11H and 11I of the MCRA provide that any person whose exercise and enjoyment of rights secured by the constitution or laws of the commonwealth have been interfered with by means of threats, intimidation or coercion may institute on his own behalf a civil action for relief, including the award of compensatory money damages.

**5.** Those claims were dismissed by stipulation of the parties on January 3, 1992. Hence, the instant case is now ripe for entry of judgment.

**6.** The Plaintiff was naturalized a citizen of this country in 1972. She was born in Nigeria, the 23rd child of her father's 15th wife. This fact demonstrates rather graphically that the cultural background of Mrs. Adedeji is quite different from the cultural background of persons with whom this Court deals more customarily. She is a child of a society whose customs and values differ substantially from those that we encounter normally in Boston or most other parts of this country.

**7.** Previous to her trip on May 6, 1986, Plaintiff had made several trips to Nigeria. In September, 1983, she went with two of the children for six weeks for a visit with her family. In August, 1985, she went with the same two children for four months, intending to live there permanently. On that occasion she shipped all of her household goods to Nigeria. On February 14, 1986, she visited Nigeria with her daughter, leaving her there and returning to the United States alone on March 1, 1986. These travels and dates were clearly reflected in her passport, which the customs inspectors examined on May 12, 1986.

cash.[8] She had been travelling for approximately 18 hours with a brief stop and change of planes in Zurich, Switzerland before finally arriving at about 3:40 p.m. at Logan Airport. After first clearing Immigration and retrieving her single suitcase from the baggage area, Plaintiff proceeded to the Customs Section at about 4:20.

At that point, Plaintiff was approached by Customs Inspector Byrd who asked to see her passport and ticket. Noting that she carried a Nigerian passport,[9] Byrd asked Plaintiff a number of routine customs questions, including the amount of currency she was carrying, her occupation and the nature of her trip. Finding her answers abrupt and somewhat non-responsive, Byrd than asked Plaintiff to accompany him to a separate table nearby where he called for the assistance of Customs Inspector Manning. The Plaintiff was asked the same questions again and gave the same responses. The inspectors entered Plaintiff's name into the Treasury Enforcement Computer System ("TECS") which reported no previous arrests or searches involving the Plaintiff. Her suitcase was then searched. Inside the suitcase, the inspectors found what appeared to be skin lotion and hair protein jelly that they felt might be used by a smuggler to insert small containers of drugs in her rectum or vagina. On the basis of these circumstances, Manning and Byrd decided to conduct a more thorough "secondary" search.

Secondary examinations and strip searches are done in a small, windowless room furnished with a table, wastebasket and file cabinet, just off the main public customs area. Once in this room, Manning and Byrd again thoroughly inspected the contents of Plaintiff's suitcase and purse and asked her additional questions. Again, Plaintiff's responses were consistent with her previous answers and no contraband was found. Noting that Plaintiff had 1) travelled several times to Nigeria during the past year, 2) purchased her return ticket to the United States on May 11, 1986, the day before she left Nigeria, 3) packed very little clothing and 4) had potential lubricants in her suitcase, Manning[10] decided to report his suspicions to Supervisor Customs Inspector Norton. Norton then authorized a strip search of the Plaintiff on the basis of what Manning told him.[11] Sometime during the strip search, one of the inspectors called the Massachusetts Osteopathic Hospital and spoke with Plaintiff's supervisor, Mrs. Russo, who confirmed that Plaintiff was indeed a nurse employed by the Hospital and was expected at work at 11:00 p.m. that night.

Upon receiving authorization from Norton, Manning contacted two female inspectors, Best and Anderson, who entered the search room and proceeded to direct the Plaintiff to take off all of her clothes and bend over so her body cavities could be visually inspected. Plaintiff hesitantly but fully complied with their requests, and

---

**8.** Mrs. Adedeji was in the habit of travelling in this way, because the cost of a round-trip ticket bought in Nigeria was substantially less than in the United States. She purchased her ticket in cash instead of by credit card because Nigeria has, exclusively so far as the evidence showed, a cash economy.

**9.** Nigeria is a country identified by the Customs Service as a narcotics "transit" country. Heroin which is manufactured elsewhere is imported into the United States through Nigeria in such frequency that Nigeria is considered by customs officials to be a high risk source country for drug smuggling. Customs policy at this time was to submit all travelers from Nigeria to questioning and baggage searches.

**10.** Manning was the senior inspector on the scene. He testified not in person but by deposi-

tion since, on the morning he was scheduled to testify, he was admitted to the Carney Hospital, with no prospect of an early discharge. Manning's deposition was not intended to be taken in lieu of his testimony. He was questioned only by Plaintiff's counsel and only for discovery purposes. It was never anticipated by anyone that he would be unable to appear as a witness. Also, it should be noted that Manning's deposition was taken more than four years after the event, in July of 1990.

**11.** Norton was never deposed. The only written record of what was told to Norton and what formed the basis of his decision to authorize the searches is Byrd's written report of the incident which another Government witness, Supervisor Inspector Haynes, described as unusually complete. Relevant parts of the report are quoted *infra*.

again, no contraband was found. Nor was any sign of lubricants found in the area around Plaintiff's rectum or vagina. Plaintiff was visibly shaken by this experience, and the inspectors testified that she was perspiring, shaking and spoke with a quavering voice as the strip search progressed. A folded tissue was found in Plaintiff's underwear, which she said she had put there because she had just finished menstruating.[12] There were no signs of lubrication or any other substance on the tissue.

After being informed briefly of the negative results of the strip search, Supervisor Norton told the inspectors to seek Plaintiff's consent for an X ray and body cavity search at Winthrop Hospital. When Plaintiff refused to consent, the inspectors informed her that she would be detained at the airport so that her bowel movements could be monitored until such time as the natural processes of elimination confirmed the presence or absence of narcotics in her alimentary canal. Plaintiff still refused to sign. The inspectors then read her the standard *Miranda* warnings. Upon hearing that she had the right to consult with a lawyer, Plaintiff asked permission to call an attorney and said that she was going to sue the inspectors for what they were doing to her. The inspectors then called Customs Agent Madden to the scene. Madden told Plaintiff that a lawyer would do her no good, and she was not entitled to one anyway because she was not under arrest. He also told her that, even if she brought a suit, she would never prevail against the Government. At one point during this discussion, Plaintiff had in her hand the tissue the female inspectors had found in her underwear and attempted to throw it into the wastebasket. This upset Inspector Manning, who had become increasingly antagonistic towards the Plaintiff, and he told her that she would be handcuffed if she

continued to "act up." Eventually, after being alternatively threatened and persuaded to "get it over with" by the inspectors, Plaintiff succumbed and signed the form.

The inspectors immediately transported Plaintiff to Winthrop Hospital where a nurse x-rayed her abdominal area. The X ray showed the presence of a fecal mass consistent with the state of a typical traveler after a long plane trip but showed no sign of secreted drugs. Dr. Oppenheim, the emergency room physician on duty, evaluated the X ray. Inspector Best, whose testimony in this regard the Court adopts, said that she asked Dr. Oppenheim in the presence of Manning if he saw any sign of drug containers in the X ray. Dr. Oppenheim, who is not a radiologist, replied that he saw nothing[13] and proceeded to perform rectal and vaginal examinations of the Plaintiff. The examinations lasted no more than a few minutes, and no drugs were found in her body. The inspectors drove Plaintiff back to Logan Airport at about 7:00 p.m., where she picked up her luggage and was released.

## III. Applicable Law

In its last session, Congress created new judgeships in federal districts where the narcotics smuggling problem is most critical. A long line of court decisions emphasizes the importance of the Customs Service's role in the war against drugs. This Court subscribes to these precedents without reservation. However, in every war mistakes are made, sometimes serious ones. In this case, that is the central allegation of the Plaintiff: that there was a serious mistake made by the customs inspectors on May 12, 1986 when she was processed at Logan Airport.

---

**12.** Byrd testified that sometimes smugglers will put absorbent paper in their underwear so that if any lubrication leaks out of their lower body cavities it will not visibly stain their clothing.

**13.** Dr. Oppenheim testified that he did not discuss his conclusions about that X ray with the inspectors and performed the rectal and vaginal examinations because he felt the X ray was not determinative of the absence of containerized

drugs. Inspector Best's testimony is consistent with the Plaintiff's, which was also persuasive. Plaintiff testified that while she was in an examining room waiting for the cavity examinations to commence she looked down the hall and saw Dr. Oppenheim, Inspector Manning and Inspector Best viewing the X ray and talking among themselves.

The leading precedent is *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). In that case, the Supreme Court held that, "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection,[14] is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Id.* at 541, 105 S.Ct. at 3310. Officials at the border must have a particularized and objective basis for suspecting a particular traveler of internal smuggling. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).[15] "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979) (citations omitted). It is not the conduct of the customs inspectors that is governed by this standard of reasonableness. It is the customs inspectors' suspicion that must be reasonable. Thus, the question here is whether the inspectors reasonably suspected this particular Plaintiff of smuggling drugs inside her body before they strip searched her, x-rayed her and had a physician search inside her lower body cavities.

In *Montoya*, the Supreme Court pointed out that its holding applies only to *detention* of suspected smugglers on the basis of reasonable suspicion. The Court wrote in footnote four: "It is important to note what we do not hold. Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for non-routine border searches such as strip, body cavity, or involuntary X-ray searches." *Montoya*, 473 U.S. at 541 n. 4, 105 S.Ct. at 3310 n. 4.

The question of what level of suspicion is necessary for non-routine border searches has been discussed by the First and other Circuits. The level of suspicion necessary depends upon the intrusiveness of the search contemplated. The law here is well settled. "What is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler." *United States v. Brown*, 499 F.2d 829, 833 (7th Cir.1974). Considered in this way, "reasonable suspicion" is a flexible standard. *United States v. Afanador*, 567 F.2d 1325, 1328 (5th Cir.1978). Contrary to the Government's contention in this case, an initial foundation of reasonable suspicion does not necessarily justify later, more intrusive searches. The quantum of facts necessary to justify a search is related to the degree of the intrusion: "what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or demeaning search." *Id.* at 1328; *United States v. Pino*, 729 F.2d 1357, 1359 (11th Cir.1984) (holding that the amount of suspicion necessary for a rectal exam is greater than that required for an X

---

**14.** No level of suspicion at all is necessary for routine searches at the border. "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant...." *Montoya*, 473 U.S. at 538, 105 S.Ct. at 3309; *United States v. Oyekan*, 786 F.2d 832, 835 (8th Cir.1986) (holding that a pat-down search of suspected passengers and search of their luggage and purses are within the scope of routine customs practice unrestricted by the Fourth Amendment). Thus, the Plaintiff has no basis to object, and has not objected, to the initial questions she was asked by the inspectors or to the search of her luggage and pocketbook.

**15.** That case, like the instant one, concerned a search at an international border "where the Fourth Amendment balance of interests leans heavily to the Government. At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with Immigration officials, with protecting this nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics or explosives." *Montoya*, 473 U.S. at 544, 105 S.Ct. at 3312.

ray search or strip search). Because of the physical touching and humiliation involved in a rectal or vaginal search, such searches must be considered more intrusive than an X ray search or a strip search where the subject is not touched.[16] The test is not whether the facts would arouse the reasonable suspicion of a factfinder in a *post hoc* determination. Rather, "the facts must be sufficient to raise the level of required suspicion in the minds of experts, those who have been taught to make these judgments...." *Pino*, 729 F.2d at 1359. The trial court must avoid second-guessing the decisions of the customs inspectors, *Montoya*, 473 U.S. at 542, 105 S.Ct. at 3311, and give due deference to their expertise and "the inherent difficulty of detecting alimentary canal smuggling." *United States v. Reyes*, 821 F.2d 168, 170 (2nd Cir.1987).

Thus, in this case, we must first determine if the facts could have made experienced and trained customs inspectors reasonably suspicious under the circumstances such that the strip search of Plaintiff was justified. If so, we must then decide if those same facts, in addition to any discoveries made during or before the strip search, were enough to warrant reasonable suspicion that the Plaintiff was engaged in internal body smuggling and justify the X ray search and more intrusive body cavity searches at Winthrop Hospital. Finally, the Court must address the question of whether Plaintiff waived her rights by signing the U.S. Customs consent-to-search form authorizing the X ray and body cavity searches at Winthrop Hospital.

Two legal issues as to which a great deal of time was spent in pretrial hearings were resolved by stipulations of the parties.[17] The first was that the Government was not entitled to benefit from the defense of qualified immunity under the FTCA, which would have been available to the individual inspectors if Plaintiff had pursued her *Bivens* claims against them.[18] The second was that, on the issue of reasonable suspicion, the Government bears the burden of proof by a preponderance of the evidence. *See, e.g. American Federation of Government Employees, AFL–CIO, et al., v. Skinner,* 885 F.2d 884, 894 (D.C.Cir.1989).

## IV. Smuggling Trends and Training of Customs Inspectors

In discussing the factors leading the customs inspectors to suspect the Plaintiff initially of smuggling, findings of the National Customs Service as to the method of importing drugs are relevant and have been considered by the Court. There are trends in this type of illegal activity which are discernible on a national basis and on a local basis as well. Several years ago, narcotics were most likely to be imported concealed in the clothing or upon the person of the smuggler, as in a money belt, girdle or false bottom of a suitcase. As law enforcement became more sophisticated in its methods of interception, the smugglers reacted, and employed other methods of smuggling. Before 1986, the most common method used by smugglers from Nigeria was swallowing balloons, condoms or other containers in which narcotics had been packaged. By 1986, swallowing as an importation method was largely superseded by concealment through insertion of small drug packages in the smuggler's rectum or vagina. During the year previous to May 1986, there were approximately

---

**16.** However, a strip search has the potential to be even more intrusive and humiliating to an individual than a body cavity search. Protracted strip searches of the kind Mrs. Adedeji experienced, conducted by officious, uniformed strangers in an unfamiliar, small and windowless room certainly have the potential to be more psychologically damaging to the person searched than a body cavity examination performed in a hospital by a trained physician.

**17.** Another legal issue resolved pretrial was whether Plaintiff's FTCA claim incorporating the Massachusetts Civil Rights Act (MCRA) was barred by 28 U.S.C.A. § 2680(a). After careful consideration, we ruled that it was not.

**18.** Public officials have no immunity and are liable under the MCRA for their discretionary acts when "they have violated a right under Federal or State constitutional or statutory law that was 'clearly established' at the time." *Duarte v. Healy,* 405 Mass. 43, 47, 537 N.E.2d 1230 (1989).

five persons apprehended at Logan Airport who were smuggling in that fashion.

Customs inspectors were alerted to all these developments by frequent national customs reports and local reports from the Boston customs office. They were also advised as to what might be signals or profile characteristics giving reason to suspect a person of this type of smuggling. Profiles are compilations of characteristics of persons likely to be smuggling, but they are not scientifically derived, nor claimed to be. There is no effort made in assembling them to differentiate the characteristics found in smugglers from those found in non-smugglers.[19]

In that connection, portions of a customs directive, although dated June 12, 1986, a month after the search in this case, are germane and informative. The opening paragraph states,

> The articulable factors listed below are frequently encountered. While one factor by itself may not be an objective, articulable factor, a combination of these factors may lead to establishment of reasonable suspicion that the person may be carrying contraband or merchandise on his person contrary to law. It would be advisable on a monthly basis to read this list, which is by no means exhaustive.

There then follows a list of 43 characteristics, several having numerous subdivisions which are sometimes disparate and often inconsistent with each other. For examples, these so-called articulable factors include: "Eyes inspector with hostility or apprehension while waiting for inspection."; "Is unusually cool, polite or cooperative"; "Is overly talkative and friendly; and "Does not converse and has a poker face." "Nervousness" has 18 subdivisions, which include: "a. clutches purse, coat, tightly; b. plays with or rearranges clothing, jewelry, and so forth; c. pats and checks pockets for no apparent reason; [and,] d. has hands and arms flexed and taut." [20]

It is important to note that the mistakes made by the inspectors and supervisor in the instant case, in the Court's view, are not attributable to any lack of training. For example, one Government exhibit, about as large as a metropolitan telephone directory, included only a portion of the materials disseminated from Washington D.C. and other offices throughout the country to the Boston customs office. Bulletins concerning smuggling trends, successful seizures, and relevant court cases are designed to keep inspectors up to date on what they should be looking for and what is happening elsewhere in the country. Whether the sheer volume of training materials may be excessive and self-defeating is a question the parties did not address, and neither do we.

---

**19.** In Boston, the customs service contracted in 1984 with the Winthrop Hospital for body cavity searches. There, approximately three quarters of the passengers whose body cavities were searched were found not to have concealed anything in them. Similarly, in other ports of entry around the country, many more cavity examinations turned out to be negative than positive. There have been no comparisons of the characteristics of those who were innocent from those who were found to be guilty. No control group, whose statistics were analyzed, was established and no causal relationship has been shown between particular profile characteristics and smuggling. Of course, the profile characteristics were not described to the Boston inspectors as being proof of smuggling, but, rather, as characteristics to look for, and, if found, to justify a more careful inspection and examination than would otherwise be the case.

The use of and reliance upon profiles has been the subject of many court cases, testimony in this case, and official bulletins and manuals disseminated by the national office of the Customs Service. In *U.S. v. Rieves*, 584 F.2d 740, 744 (5th Cir.1978), the court stated that, "while we recognize as we have before that mere resemblance to a smuggling profile will not permit a reasonable conclusion that a strip search should occur, we again hold that certain circumstances notwithstanding the fruitless search of luggage may well render a physical search reasonable." That holding is consistent with the Customs Service's dissemination of these profiles and the use to which they may properly be made by inspectors on the scene.

**20.** There was considerable testimony from Government witnesses as to the nature and proper use of profiles, especially by Mr. O'Gorman, who is an instructor of customs inspectors in Washington D.C.. It left no doubt that only careful questioning by a trained inspector can make profile factors reliable indicators of drug smuggling.

### V. Inspectors Lacked Reasonable Suspicion

Turning now to the main issues of fact, the decisions to search the Plaintiff, whose reasonableness *vel non* must be the focus of the Court's analysis, were made by Supervisor Norton. The Court's problem, and the Government's, is twofold: first, Norton is deceased and did not write a report; second, there is no specific evidence except for Byrd's report as to what any of the other inspectors told Norton.

■ Byrd never went to talk to Norton before Plaintiff was strip searched,[21] but did write a report—the key exhibit in this case—on Customs Form 151, entitled "Search/Arrest/Seizure Report". Section 28 thereof calls for the reasons for the search, and states as follows: "Reasons: Evasious [sic] answers, extremly [sic] large amt. of luggage, numerous trips to source country." The statement is continued in Section 40, entitled "Circumstances and Remarks", as follows:

> Pax [abbreviation for passenger], Nigerian citzen [sic]; alien resident approached by Insp. Manning & Byrd. Upon questioning it was revealed that Pax had travelled numerous times to Nigeria in the past year. It was also ascertained that Pax purchased return ticket yesterday (5–11–86); her husband also lives in Nigeria. Upon exam of luggage it was noted Pax had lubricants in suitcase. Also Pax had very little clothing. With these articubale [sic] facts, SCI Norton authorized a personal search by female insp. Best & Anderson. It was determined to have an x-ray [sic] and rectal exam at Winthrop Hospital. At 1702 hrs Pax refused to sign the consent form. At 1706 hrs the Miranda warning was given to Pax by insp Byrd witnessed by Manning and Best. At first Pax demanded lawyer then consent [sic] when shown that she·was detained and not under arrest. Insp. Manning, Best & Byrd took Pax to Winthrop Hospital.
>
> Departed Logan at 1739 hrs and arrived at Winthrop Hospital at 1754 hrs. Exam and x-rays [sic] proved negative. Dr. Opperheim [sic] conducted the exam. Depart Winthrop Hospital at 1843 hrs and arrived at Logan at 1853 hrs. Upon arrival at Logan, Pax at first refused to take her baggage and passports & related articles (alien reg. card & drivers license). Finally Pax took items and departed. Pax stated upon departing she would bring a legal suite [sic] upon said inspectors and took badge numbers of insp. Byrd, Best & Manning.

It is necessary, therefore, in order to determine if trained customs inspectors could reasonably suspect the Plaintiff on the basis of these articulable factors, to examine each of them in light of the overall circumstances and the inspectors' ability to verify or dispel their suspicions at the time.

1. *Evasive Answers.* The inspectors testified that the Plaintiff often hesitated before answering questions, seemed annoyed about the questioning and would sometimes answer a question with a question. For example, Manning testified on deposition that, when asked how much currency she was bringing into the country, Plaintiff at first responded, "Why do you want to know that?" The particular evasiveness shown, however, was not enough, either alone or in conjunction with other grounds for suspicion, to give a basis for reasonable suspicion that the Plaintiff was carrying drugs. Plaintiff, who is an intelligent and well-educated woman, was asked the same questions at least three times. She had just completed an 18 hour journey and was due at work in a few hours. Even though she had travelled often before, she had never previously been detained and questioned by customs inspectors and thought the entire procedure was unwarranted. These factors could have easily, and understandably, caused her to be "evasive" in the manner described by the inspectors.

---

**21.** Inspector Manning, who consulted Norton, said on deposition that he told Norton every basis of suspicion mentioned in the deposition. But Manning spent only a few minutes with Norton, and took about ten times that amount of time at his deposition describing the basis of his own suspicion.

2. *Luggage.* Byrd testified that the fact that Plaintiff had one large suitcase with very little clothing in it aroused his suspicion. Why this aroused his suspicion in light of the other information he had at the time, however, is unclear. It was apparent from Plaintiff's passport that she had stayed in Nigeria during this trip for less than a week. Although the suitcase was not available for the Court to examine, Plaintiff's uncontroverted testimony was that the suitcase was small enough to fit underneath an airplane seat. She checked it in Lagos only because she wanted footroom during the 18 hour journey. Furthermore, the inspectors were aware from shipping documents found in her purse that the Plaintiff maintained a second home in Nigeria where her husband lived. They were also aware from calling her supervisor at work that she had left for Nigeria in a hurry to care for a very sick relative. They had only to ask Plaintiff to learn that the reason she had brought back only a few clothing items was because she had left the rest at her home in Nigeria to be cleaned in anticipation of returning there.

3. *Numerous Trips To Source Country.* Byrd testified that his suspicion was also aroused by the fact that Plaintiff's passport showed she had made three trips to Nigeria in the previous six months. This fact might have initially formed part of a valid basis for reasonable suspicion, especially if they were trips of the short duration typically made by smugglers. However, Byrd's inquiry should not have ended there. He knew from Plaintiff's explanation, as corroborated by the telephone conversation with her supervisor at work, that the purpose of her trip was to visit a very sick relative. By simply asking why she had traveled to Nigeria so frequently, Byrd or any of the other inspectors would have discovered that most of her family lived in Nigeria and that all but one of these trips had been in the company of at least one of her children. Furthermore, during one trip she had stayed in Nigeria for close to four months in an unsuccessful effort to settle there permanently. Again, many of these facts were corroborated by documents in her purse at the time. Had the inspectors made these simple inquiries and connections, as trained, reasonably proficient inspectors should have, they would have discovered that the Plaintiff's travel history was not indicative of drug smuggling.

4. *Ticket Purchase.* The fact that Plaintiff purchased her ticket in cash the day before she left Nigeria could also be considered as part a valid basis for reasonable suspicion if examined out of context. Again, however, the inspectors ignored other explanatory factors known to them at the time and failed to make further simple inquiries that would have dispelled their suspicion. Byrd testified that he knew Nigeria was purely a cash economy and that an airplane ticket could not be bought there by check or credit card. What he may not have known, but could easily have learned by questioning the Plaintiff, looking at the price of the ticket and checking the exchange rate there at the airport, was that it was also much less expensive for travelers to buy round trip tickets in Nigeria than in the United States. Plaintiff had, in fact, on the round trip in May, traveled to Nigeria using the second half of an open return date round trip ticket she had purchased on her last trip to Nigeria in March of 1986. Had the inspectors considered all of these known or easily discoverable factors, any reasonable suspicion they had concerning the purchase of the ticket would have been largely eliminated.

5. *Lubricants In Suitcase.* Byrd testified that one of the primary reasons he suspected the Plaintiff was "body packing" drugs was that she was carrying cosmetic products, such as skin lotion and hair protein jelly, in her suitcase that he believed were potential lubricants.[22] On cross-examination, it became apparent that Byrd considered scores if not hundreds of similar cosmetic items that can be found in the

---

**22.** Byrd testified that he found a jar of hair care ointment and a container of hand moisturizer in Plaintiff's suitcase. The Court heard testimony from a number of Government witnesses that lubricants are often used by drug smugglers to make it easier to insert small containers of drugs into their lower body cavities.

suitcases of most travelers to be potential lubricants. It is difficult, therefore, to conclude that the presence of any of these "lubricants" in a traveler's suitcase could make them more suspect than any other traveler. Furthermore, Plaintiff's suitcase had been checked in Lagos and was not available to her during the approximately 18 hour trip. This evidence, or clear lack of evidence, could not form the basis of reasonable suspicion permitting either the strip search or the subsequent searches.[23]

These five factors are presumably those on which Norton relied when he authorized the searches. However, in the interest of thoroughness, we will go further and discuss other factors cited by the inspectors in their testimony. Manning stated on deposition that he felt a woman employed as a nurse probably couldn't afford the frequent travel that Plaintiff had engaged in. This hasty inference ignores: 1) the fact that Plaintiff had a husband who was employed, 2) the fact that the inspectors never inquired as to the Plaintiff's or her husband's wealth and earnings, and 3) the high priority a person living a continent away from most of her immediate family would place on travel to visit them.

Manning also relied on the presence of a Kleenex box in Plaintiff's suitcase as a basis for suspicion. But he ignored the fact that, like the "lubricants," the Kleenex box was checked at Lagos and unavailable to the Plaintiff during her trip. Furthermore, the box was unopened and, thus, the Kleenex could not have been used to wipe off lubricants or for any other illicit purpose. Both Byrd and Manning also mentioned that, when they opened the Kleenex box in the secondary search room and questioned Plaintiff about it, she pulled some tissues out, threw them at Manning and said agitatedly, "See, it's just Kleenex!" By the time Mrs. Adedeji was questioned about the Kleenex box she was, without question, impatient, exasperated and indignant. At that point she had been asked three times the routine questions she had answered in writing on her declarations and customs forms. Her exasperated response added nothing to the reasonableness of the inspectors' suspicion.

Byrd testified that a suspicious piece of paper with a telephone number written on it was found in Plaintiff's purse which she explained, after some reflection, was a taxicab company's number. Byrd testified that they could not call the number to verify Plaintiff's statement at the time for fear that they would tip off a possible drug buyer or cohort of the Plaintiff's who might otherwise be apprehended and prosecuted. Other Government witnesses, however, testified that Inspector Manning was a member of the Contraband Enforcement Team and had access to a reverse telephone directory that would have enabled the inspectors to verify Plaintiff's story without calling the number.

Byrd also testified that Plaintiff threatened to sue the inspectors shortly after they began to look through her suitcase and that this made them suspicious. Plaintiff denied this and said she only threatened to sue after the completion of the strip search. In this respect, the Court adopts Plaintiff's version.[24] Byrd's testi-

---

**23.** Even if the strip search were warranted, the discoveries made during it, such as the absence of any sign of irritation or lubrication around the lower body cavities, produced no relevant evidence to support the reasonableness of the inspectors' suspicion.

**24.** Inspector Byrd experienced a persistent lack of recollection concerning the events surrounding this case. For examples, was Plaintiff wearing bulky clothing? He could not recall. Was there a customs form available in May of 1986 whereby only an X ray could be consented to as distinguished from a combination X ray and body cavity search? He could not recall. He was asked about special training he had re-

ceived concerning searching suspicious passengers. He could not recall either the training materials or who had given him the training. He was shown files of arrests he had participated in where positive searches of travelers had been made and drugs had been found. After the files were shown to him and the names of the suspected travelers were stated to him, he still could not remember the events, even though the number of successful searches of travelers from Nigeria in which he had participated in the years in question were ten or fewer. When he was asked whether the female inspectors told him that there was nothing found on the tissue in Plaintiff's underwear after the strip search, he could not remember.

mony was inconsistent with both his deposition and his affidavit. In contrast, Plaintiff's testimony was generally credible, and she is more likely to have a clear memory of the traumatic events on May 12, 1986 than the inspectors who have a multitude of similar cases to process.[25]

The inspectors also failed to be cognizant of factors which should have lessened their suspicion. For example, there is the fact that Plaintiff was and is a nurse of obvious intelligence and education. They knew from the contents of her purse that she held a bachelor's and a master's degree. In contrast, as several Government witnesses testified and as prior cases suggest, most people who are caught smuggling drugs by "bodypacking" are poor and uneducated. *United States v. Oyekan*, 786 F.2d 832, 840 n. 14 (8th Cir.1986).

Taking all of these factors into account and examining them from the perspective of a reasonable, well-trained customs inspector, the Court finds that the inspectors did not employ the profile factors as they were meant to be used. Rather, they applied them mechanically, failed to consider the totality of the circumstances and failed make many simple inquiries that would have soon dispelled their suspicions. After they learned that the Plaintiff was Nigerian and had traveled frequently to and from that country, she faced an up-hill battle to prove she was not carrying drugs. When suspicious factors prove to be consistent with innocent behavior within the context of the entire circumstances, they lose their predictive value and should not be given substantial weight as a basis for reasonable suspicion. Here, Plaintiff did not give an "implausible explanation" of the purpose of her trip, *Oyekan*, 786 F.2d at 838 n. 11, or a story that "did not ring true," *United States v. Ramirez Cifuentes*, 682 F.2d 337, 340 (2nd Cir.1982).

On the contrary, the facts discovered by the inspectors supported Plaintiff's story. Finally, nothing was discovered during the strip search inconsistent with Plaintiff's protests of innocence. Hence, the subsequent searches at Winthrop Hospital also violated the MCRA unless Plaintiff voluntarily consented to them.

**VI. Plaintiff's Consent to Examinations at Hospital**

■ As the *Montoya* decision makes clear, the inspectors must have reasonable suspicion that an individual is attempting to smuggle drugs into the country in her alimentary canal before they can detain that individual in order to monitor her bowel movements. *Montoya*, 473 U.S. at 541, 105 S.Ct. at 3310. Perhaps in response to footnote four in the *Montoya* decision, the Eleventh Circuit has held that *"once reasonable suspicion has been established,* Customs agents can transport the suspected carrier to a hospital for an x-ray exam that is not physically forced, regardless of whether the carrier has 'freely and voluntarily' consented to the exam."* *United States v. Saldarriaga–Marin*, 734 F.2d 1425, 1428 (11th Cir.1984) (emphasis added). Even under this more restrictive view of Fourth Amendment rights, it is clear that, lacking reasonable suspicion, the inspectors in this case could not properly give the Plaintiff the choice of either being detained until her monitored bowel movements proved she was not carrying drugs or consenting to an X ray and body cavity searches. *Compare Reyes*, 821 F.2d at 171 (holding that giving such a choice to suspect was proper when inspectors had reasonable suspicion). Thus, in order to x-ray the Plaintiff and search her body cavities, the inspectors would have had to get Plaintiff's voluntary consent.[26] "While individu-

He could not remember if the Kleenex box found in Plaintiff's suitcase was unopened.

**25.** Although some Government witnesses testified that it was being phased out at the time Plaintiff was searched, for many years, the Customs Service credited certain types of inspectors like Byrd with points that counted towards promotion for each successful seizure of contraband made. Thus, there was a definite motive

for customs inspectors to search as many travelers as possible.

**26.** We need not decide whether it is *ipso facto* improper to present a traveler with a consent form that combines consent to body cavity and X ray searches. It would seem that there should be separate forms, or that the consent to vaginal and rectal examinations should be contingent upon a positive X ray. Of course, if a

al rights may be waived, such waivers must be voluntary ... [and cannot be coerced] by the threat of continued incarceration." *Hall v. Ochs*, 817 F.2d 920, 923 (1st Cir.1987). Plaintiff's consent is invalid under such circumstances and cannot be used by the Government to exculpate otherwise tortious behavior.

Even if the "choice" given to Plaintiff had been proper, her signed consent was nevertheless coerced by the inspectors. Plaintiff refused several times to sign the form when the inspectors first requested that she do so. The inspectors, however, did not leave it at that. Instead, they read her the *Miranda* warning, giving her the impression that she was about to be arrested.[27] When she requested a lawyer upon hearing her right to be represented by counsel, Agent Madden told her that a lawyer would do her no good. Madden also told her she had no present right to a lawyer because, even though she was not free to leave, she was not under arrest. Still standing in the small, windowless secondary search room having just been strip searched and surrounded by uniformed inspectors, Plaintiff was encouraged to admit her guilt, pass the drugs out of her body and just "get it over with." Plaintiff explained that she had no drugs inside her and had no guilt to admit. When she attempted to throw away the tissue the female inspectors had found in her underwear, Manning threatened to handcuff her. Under these circumstances, when Plaintiff eventually signed the form, she signed only because her will had been overcome by the continuous and determined pressure put on her by the inspectors through threats, intimidation and coercion.

VII.  Assault and Battery and False Imprisonment

■ In deciding whether the United States should be liable for common law assault and battery upon the Plaintiff, the Court is guided by *United States v. Velez*, 693 F.Supp. 51 (S.D.N.Y.1988). We note, first, that the claim could apply only to what occurred at the hospital. Since the customs inspectors never physically touched the Plaintiff, the assault and battery claim here "refers to the physical contacts with [the Plaintiff] by the hospital staff carrying out the various procedures." *Id.* at 58. True, the customs inspectors were responsible for what was done at the hospital. "To the extent that these procedures occurred while [the Plaintiff] was properly detained, the procedures were proper." *Id.* at 58. In Mrs. Adedeji's case, detention at the hospital was not proper. However, as in *Velez*, "[t]o the extent that [these procedures] occurred after the Plaintiff should have been released, they were part and parcel of the improper detention. They did not rise to the level of a separate tort of assault and battery." *Id.* at 58. Therefore, the Court orders the dismissal of this common law claim.

■ With respect to the false imprisonment allegation, detainment of a suspected smuggler, up to the commencement of the strip search, involves no false imprisonment because the inspectors need have no suspicion at all in order to search international passengers' luggage and question them. *Montoya*, 473 U.S. at 538, 105 S.Ct. at 3309. Thus, the initial detention of Plaintiff was proper. However, the Plaintiff was falsely imprisoned from the commencement of the strip search at 5:00 p.m. until 7:00 p.m., the time when she was finally released. The Government's liability is also predicated upon this finding. The customs inspectors were clearly and directly involved in the restraint of Plaintiff's freedom to leave the airport and the hospital. *Hall v. Ochs*, 817 F.2d 920 (1st Cir. 1987); *see generally Ortiz v. County of*

---

qualified radiologist determines that an X ray of a suspected internal smuggler is negative for drugs, the individual should be released. *Velez v. United States*, 693 F.Supp. 51 (S.D.N.Y.1988).

**27.** A Customs Service procedural directive entitled Standard Procedure For Processing Sub-

jects Port of Boston For X–Ray and Medical Examinations, was presented as evidence in this case. It states, in relevant part: "If test results on foreign matter are positive, give *Miranda* warnings. Place under arrest and handcuff."

*Hampden,* 16 Mass.App. 138, 140, 449 N.E.2d 1227 (1983).

## VIII. Damages

Under the MCRA, compensatory damages, and none other, are recoverable if Plaintiff proves by a preponderance of the evidence that the Government's wrongful acts or omissions are a proximate cause of the Post Traumatic Stress Disorder ("PTSD") which the Government concedes she suffered from subsequent to the events on May 12, 1986. An injury is proximately caused by an act when it appears from the evidence that the act played a substantial part in bringing about or actually causing Plaintiff's injury and that injury was either a direct result or a reasonably probable consequence of the act. *See Jorgensen v. Massachusetts Port Authority,* 905 F.2d 515 (1st Cir.1990); Restatement (Second) Of Torts §§ 431, 433 (1977). It was the opinion of the Government's psychiatric expert, Dr. Bursztajn, that an event that occurred in 1968 was the actual cause of Plaintiff's PTSD. We do not eliminate the possibility that such an event may have contributed to some extent. The Court finds, however, that the proximate cause of Plaintiff's suffering, for reasons explained below, was the events surrounding the several searches performed on her on May 12, 1986.

The first element of damage is the loss caused by the strip search, namely the shock and its aftereffects experienced by this responsible, excitable and modest woman whose personality flaws, if they can be called that, made it extremely difficult for her to undergo a strip search that in some respects could be compared to a striptease search. The purpose of the search was to look at the areas surrounding Plaintiff's rectum and vagina to observe any indication of internal drug smuggling such as irritation or the presence of lubricants. For unexplained reasons, however, the inspectors did not have the Plaintiff simply take off all of her clothes, put them on a chair or table and bend over for inspection. Instead, she was compelled to remove her clothing a piece at a time. Briefly, the evidence shows that she stood there in the secondary search room, naked from the waist up, shaking, frightened and looking at two uniformed strangers while they examined her blouse for concealed narcotics. Only after some time did they say to her, "All right. Everything. Take your pants off and your underpants." Plaintiff described in her testimony her experience there, stark naked, while the inspectors looked at her. She testified about how she felt dehumanized, like an animal. She was then directed to bend over and spread her buttocks with her hands so the inspectors could examine her more closely. Both the inspectors and the Plaintiff testified that she was shaking considerably by this point. It is clear that she was completely traumatized.

The events described above are what Plaintiff testified return to her again and again in nightmares, and the Court so finds, adopting the testimony of both the Plaintiff's and Government's psychiatric experts. Both agreed that Plaintiff suffers from PTSD. They disagreed, however, on the source of the trauma which induced the disorder.[28] Generally speaking, the Court

---

28. Plaintiff was married; she is presently divorced. She had five children, one of whom died in a tragic accident in 1968 when she lived in Nigeria. Her son Femi, at age 5, was playing with playmates when, in the course of roughhouse or play, his companions pushed him into a well, and he drowned. A later-born son was given the same name and was described by Dr. Bursztajn as a "replacement son." Dr. Bursztajn felt that the serious illness that this second son contracted, which precipitated the Plaintiff's sudden trip to Nigeria, was the occasion for her being unable to cope with the reliving of the fear and anxiety she suffered when her first son died.

This is not an impossible explanation, and the Court does not find that Dr. Bursztajn's testimony was without foundation or unscientific. However, we do not adopt it. The trauma Plaintiff experienced at the death of her first son occurred 18 years before May 12, 1986. In addition, when Plaintiff came back to the United States, her sick son had mostly recovered. She was in a pleasant, optimistic frame of mind with reference to her son's health. The symptoms both doctors agree on clearly reflect, in the Court's view, that the cause of the PTSD was the events on May 12, 1986 and not the death of her first son. Furthermore, Dr. Bursztajn's testimony, except for his reading of Plaintiff's

found Dr. Grassian's testimony credible and reliable, despite relevant if unpersuasive challenges on cross-examination to his professionalism and objectivity.

The psychiatric experts agreed that Plaintiff's PTSD requires her to take calming medication, such as Valium and Halcion. The principal points of their agreement as to the symptoms she suffered are as follows:

(1) Massive free-floating anxiety which has lessened over time but will persist to some extent for the balance of her life.

(2) Clinical depression which originally manifested itself in suicidal ideation. This includes both social withdrawal and loss of self-esteem which the Plaintiff still suffers from. The suicidal ideation ended within approximately nine months after the searches took place, and the symptoms of social withdrawal have also lessened.

(3) Intrusive recollections. These are not simply memories of the events of May 12, 1986. They are recollections which overwhelmingly invade the consciousness of the Plaintiff and cause her to relive mentally the experience of the searches.

(4) Insomnia which has lessened over time, but still persists to some extent.

(5) Fear of encounters that remind her of the searches, such as gynecological exams and undressing in front of others. This is especially distressing to the Plaintiff since much of her family still lives in Nigeria, and she cannot visit them without going through customs inspections. In addition, her name is now listed in the TEC system, so that when she returns to the United States, at whatever point of entry, she is likely to be searched again.

(6) Nightmares that are more frequent and different in content than those she experienced before May 12, 1986 and that increase in frequency when the Plaintiff encounters experiences reminding her of the events of that night.

(7) At least a temporary diminution of her efficiency in her job, as attested to by her supervisor, Mrs. Russo, who testified that Plaintiff made many more mistakes and seemed very depressed and "different" after May 12, 1986.

(8) Lastly, Plaintiff experienced a diminished ability to enjoy life, or so-called "anhedonia." This includes the difficulties she has had in sexual relations since the searches took place.

In coming to a fair determination of damages, the Court must do its best to compare Plaintiff's quality of life before and after May 12, 1986 and the proximate cause of those differences. She certainly was not accustomed to what many would consider an enjoyable lifestyle before the searches. She changed jobs frequently, and there was often an insecurity about her situation. In addition, there were significant reasons that she might otherwise experience some depression. She was far away from many of her immediate family members and had lost her first-born son years ago to an accident. From the standpoint of enjoyment of sexual activities, she lived in a different country than her husband and only saw him infrequently. The Court has considered all of these factors in making a determination of damages.

Plaintiff must also prove the likely cost and clear requirement of future psychiatric services. To the extent that awards are made for recovery on account of future expenditures or conditions, a discounting process has been followed by the Court. *See Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983).

## IX. Conclusion

Considering all of the elements above, the Court finds that the Plaintiff has established her case under the MCRA as brought to this Court through the auspices of the Federal Torts Claims Act. Plaintiff has proven that the United States, through

---

records and previous testimony, was based completely on two 90 minute meetings he had with Plaintiff almost five years after May 12, 1986. In contrast, Dr. Grassian observed Plaintiff over

the course of many interviews and changes in her circumstances beginning shortly after May 12, 1986. Thus, the basis for his opinion was much less theoretical than that of Dr. Bursztajn.

its employees, has interfered with her rights as secured by both the Constitution of the United States and the Massachusetts constitution by threats, intimidation and coercion, and that she is, therefore, entitled to recover compensatory damages. The Plaintiff is awarded $200,000 for past and future pain and suffering and false imprisonment and $15,000 for past and future psychiatric care necessitated by the events of May 12, 1986, a total of $215,000. Judgment for the Plaintiff against the United States shall enter in that amount.[29]

SO ORDERED.

29. After a hearing and by separate memorandum of decision, dated December 27, 1991, the Court has ruled that Plaintiff is not entitled to attorney's fees.