**Rhonda KANE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV 93–4771.**

United States District Court, E.D. New York.

April 18, 1997.

**28**

Jonathan C. Moore, New York City, for Plaintiff.

Zachary W. Carter, United States Attorney, Brooklyn, NY (Nancy A. Miller, Assistant United States Attorney, of counsel) New York City, for Defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiff Rhonda Kane brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (the Act), to recover damages for injuries sustained at the hands of United States Customs Service inspectors, who stopped her at John F. Kennedy Airport. Plaintiff claims that the inspectors not only searched her baggage and held her for a monitored bowel movement, but also strip searched her and coerced her into consenting to an x-ray, all "with no basis whatsoever" to believe she had drugs. Plaintiff seeks damages of more than $2,000,000.

■ Section 1346(b) of the Act gives jurisdiction to this court over actions asserting claims against the United States for damages caused by the "negligent or wrongful act" of a government employee acting within the scope of his or her employment where the United States, if a private person, would be liable under the law of the place where the act occurred. New York law applies federal law to determine the legality of the inspectors' acts. *Caban v. United States*, 728 F.2d 68, 72 (2d Cir.1984). The question is whether or not they acted unlawfully.

**I**

In mid-March 1992 plaintiff traveled to Mali in Africa to meet her husband and his family. Her husband had gone there in January 1992 to develop a business selling computer equipment and services. Plaintiff, living in Maryland, bought a ticket from an upstate New York travel agency.

A friend drove her from Maryland to John F. Kennedy Airport, and she arranged to have him meet her upon her return. She left Mali on March 31, 1992 on Sabena Airlines, stopped over for ten hours in Brussels, and arrived at John F. Kennedy Airport about 1:40 P.M. on Sabena flight 541. She wore traditional African clothes made for her by her mother-in-law. Of the passengers on the flight some 20 to 25 were African–American, and, as plaintiff testified, some wore African garb.

After plaintiff retrieved her baggage, Customs Inspector Sandra Katigbak randomly stopped her and asked her whether she spoke English. She said yes, she was an American citizen and produced her passport. Plaintiff resented the manner in which Katigbak motioned her over and began to question her about the purpose of her trip, her husband's business, and her own occupation. Katigbak began to search plaintiff's baggage, and noticed that plaintiff's clothes were bulky and that her ticket was bought a few days before leaving New York from a New York State agent although she lived in Maryland. Katigbak found vaseline in one of the bags and observed that plaintiff was sweating and fidgeting, her hands shaking.

While Katigbak was looking through the baggage Supervisory Customs Inspector Sam Stabile noticed plaintiff giving "a hard time" to Katigbak, yelling at and abusing her. He therefore joined them at the inspection table. Plaintiff complained to Stabile that she was being singled out because she was Black and the inspectors were racists, and voiced her impatience with the time taken to inspect her bags. Stabile tried to explain to her, with little success, that she was subject to a Customs examination be-

cause she had arrived on an international flight.

After the inspector had completed inspection of the baggage and found no drugs, Katigbak asked Stabile for permission to make a pat-down search. Stabile agreed. Inspector Loretta Dowd joined Katigbak and plaintiff in another room and started to pat-down plaintiff. Plaintiff objected, told Dowd to take her hands off, and said she did not have drugs. Raising her voice, plaintiff said that what was going on was totally wrong and that she was being picked out because she was a Black woman.

In a few minutes Katigbak came out of the room and reported to Stabile that plaintiff would not continue to cooperate with the pat-down. Stabile then entered the room and asked plaintiff to cooperate with the search, and sent Inspector Sandra Palmer, who is a Black, into the room. After a few moments Palmer reported that plaintiff was still refusing to be searched.

Since the pat-down had not been completed Stabile decided that it was appropriate to do a strip search. He went into the room and so advised plaintiff, explaining to her what a strip search was and why there was a need to do it. He said that if nothing was seen from the search she would be free to leave.

Plaintiff, Katigbak, and Dowd went back into the room. Katigbak soon opened the door and told Stabile that plaintiff would not cooperate with a strip search and wished to be x-rayed instead. Stabile agreed and presented an x-ray consent form to plaintiff. Plaintiff then said she did not know how to read or write in English. Stabile showed her the Customs declaration filled out and signed by her. Plaintiff said that nevertheless she would not consent to an x-ray.

Stabile then told Katigbak to read to plaintiff her *Miranda* rights and inform her that she would be detained for a monitored bowel movement. He directed Katigbak to take plaintiff to the medical facility. Stabile did not order a body cavity search.

Plaintiff was taken to the medical facility, handcuffed, and later shackled and was held for about two and three quarters hours

awaiting a bowel movement. She then said she would consent to be x-rayed. Two x-rays were taken and proved negative for the presence of foreign bodies. Accordingly plaintiff was released.

## II

Plaintiff is a respectable, articulate, and well educated person. Even at a young age she has had a successful business career in sales as a corporate account manager. There has been no blemish on her record, and she had never in the past been involved in litigation. She naturally and justifiably felt that she was entitled to respect.

She had traveled to Europe only once before and on her return from France had passed through Customs without being subjected to a search. She was thus not likely to be familiar with the authority granted to the Customs Service to make searches to interdict the importation of narcotics by those who pose as thoroughly respectable citizens and resort to deceptive, indeed desperate, measures to hide drugs by carrying them internally.

Under the circumstances it is perhaps not surprising that plaintiff resented being stopped for an inspection and for a pat-down search. Since she had no drugs she felt that there was no point to many of the questions asked about her own and her husband's affairs, and she declined to give details as to either. From the outset she believed that she was being discriminated against because she was Black and was dressed in African clothes.

At some point she went so far as to tell the inspectors that they were racists and members of the KKK, that all New Yorkers were racist, and that she was doing what she was doing for Martin Luther King. She felt that she was unfairly treated and that she had been coerced into signing the consent to submit to an x-ray.

## III

Unfortunately there is no easy and comfortable way for a Customs inspector to determine whether a traveler is carrying narcotics internally. To take the word of the

person is obviously not feasible. Lacking external signs the inspectors must rely on other facts suggesting a possibility of the presence of drugs. But the law construing the Fourth Amendment to the Constitution requires that possibility to be based not on "mere chance" or an "inchoate and unparticularized suspicion or 'hunch.'" Even if drugs are discovered after a search based merely on a "hunch" the search is illegal and the narcotics may not be offered in evidence at the later criminal trial of the traveler. There must be a particularized, reasonable suspicion that the narcotics are within the body of the individual. *United States. v. Montoya de Hernandez*, 473 U.S. 531, 540, 542, 105 S.Ct. 3304, 3309, 3310, 87 L.Ed.2d 381 (1985); *United States v. Esieke*, 940 F.2d 29, 33–34 (2d Cir.1991).

Since a search may be based on suspicion, albeit particularized and reasonable, presumably a not inconsiderable number of innocent persons will be required to undergo procedures similar to those shown in this case. *Montoya*, 473 U.S. at 545, 105 S.Ct. at 3312–13 (Stevens, J., concurring). Although it is no solace to those who undergo what must be felt as a humiliation, that is, alas, the price that on occasion even the most respectable persons coming across the border must pay if drugs carried internally are to be found.

 The court finds that the inspectors were legally justified in what they did. The law did not require individualized suspicion to make the initial stop of plaintiff or to conduct the routine search of her baggage, effects, or person. *Id.* at 538, 105 S.Ct. at 3308. The question is whether the inspectors had the requisite degree of particularized suspicion to permit the proposed strip search and to hold plaintiff for a monitored bowel movement after she declined to sign an x-ray consent form. Stabile did not order a cavity search, and none was performed.

The record shows sufficient facts for the inspectors to conclude that there was a particularized, reasonable suspicion that plaintiff was carrying drugs. The court does not agree that plaintiff's eventual signing of the consent form was coerced or that the inspectors acted out of vindictiveness.

Plaintiff had arrived from a high risk area of western Africa. She had been there for no more than two weeks and had some $2000 with her. Her airline ticket was bought in New York although she lived in Maryland. She said she was employed in sales but declined to give details as to what she did or as to her husband's business in Africa. Someone drove her from Maryland to New York but she did not explain who took her or how she would return. In her baggage was found a Vaseline substance which would have been useful in inserting drugs.

After she said she preferred to be x-rayed rather than strip searched she refused to sign the consent form, claiming that she could not read or write English, a statement patently untrue. Plaintiff's recalcitrance in answering questions and refusal to cooperate with the inspectors' search, as well as her general evasiveness, while perhaps understandable, simply added to the degree of the suspicion that she might have narcotics.

Plaintiff relies on *Adedeji v. United States*, 782 F.Supp. 688 (D.Mass.1992), in which the court held that the claimant was improperly subjected to a cavity search and held for a bowel movement. That case has some features similar to those present here, including the fact that the claimant had some hair petroleum jelly in her suitcase. But each case turns on its own facts. In *Adedeji* the judge stated he did not believe some critical testimony of the inspectors. In the present case the court finds the substance of the testimony of the inspectors to be credible. Moreover, the claimant in *Adedeji* was subjected to the humiliation of a cavity search. Plaintiff was not.

The foregoing consists of the court's findings of fact and conclusion of law.

The complaint is dismissed. Judgment may be entered for defendant. So ordered.